**Clarence ABRAHAM, et al., Appellants**

v.

**UNION PACIFIC RAILROAD COMPANY, Appellee.**

No. 14–06–00419–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 28, 2007.

Rehearing Overruled Aug. 23, 2007.

---

U. Lawrence Boze, Houston, TX, and Richard P. Kinnan, Los Angeles, CA, for appellants.

Deborah A. Newman, Kent Rutter, Lynne Liberato, Houston, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices HUDSON and EDELMAN.

## OPINION

ADELE HEDGES, Chief Justice.

Appellants, 293 former and current employees of Union Pacific Railroad Compa-ny,[1] appeal a summary judgment in favor of Union Pacific. In a single issue, appellants argue that their medical causation evidence was sufficient to overcome appellee's motion for summary judgment. We affirm.

## I. BACKGROUND

Appellants filed a toxic tort suit under the Federal Employers Liability Act ("FELA") alleging that exposure to creosote used in the treatment of railroad ties caused appellants to suffer diseases of the throat, lungs, and skin including cancer. *See* 45 U.S.C. §§ 51–60. The trial court set a trial date for a "test plaintiff," Leslie Duncan. Mr. Duncan worked at Houston Wood Preserving Works where he loaded treated railroad cross-ties onto railroad cars. Medical records indicate that Mr. Duncan smoked cigarettes and regularly drank a moderate amount of alcohol. Mr. Duncan died from throat and lung cancers in 2002.

After appellants produced the affidavit of their medical expert, Dr. James Dahlgren, appellee filed a motion for summary judgment on both traditional and no evidence grounds. Appellee based its motion on the ground that Dr. Dahlgren's affidavit was no evidence of causation because it did not contain scientifically reliable and legally sufficient expert evidence. The trial court granted summary judgment in favor of appellee against Mr. Duncan. Almost a year later, appellee filed a motion for summary judgment against the remaining appellants. The trial court subsequently granted summary judgment against all appellants.

## II. STANDARD OF REVIEW

A no-evidence motion for summary judgment must be granted if: (1) the moving

---

1. Appellants' full names are listed in an appendix to this opinion.

party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof at trial; and (2) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements. *See* Tex.R. Civ. P. 166a(i). In reviewing a no-evidence summary judgment, we review the record in the light most favorable to the nonmovant to determine whether more than a scintilla of evidence was presented on the challenged elements of the nonmovant's claim. *See Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002). When a trial court's order granting a no evidence summary judgment does not specify the ground relied upon for its ruling, the summary judgment will be affirmed if any of the theories advanced is meritorious. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001).

■■■ A party may object to the reliability of expert testimony either before trial or when it is offered. *See Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002). Once such an objection is made, the burden is on the proponent of the evidence to establish its reliability. *Id.* A trial court's decision whether to admit expert testimony is reviewed for abuse of discretion. *Id.* In addition to being a determinant of the admissibility of such evidence, the reliability of expert testimony is also a prerequisite to its legal sufficiency. *See Merrell Dow Pharms. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997). In the context of a motion for summary judgment where, as here, expert evidence relied on by the nonmovant is objected to by the movant based on reliability, the evidence must be both admissible and legally sufficient to withstand the no evidence challenge. *See Frias v. Atlantic Richfield Co.,* 104 S.W.3d 925, 928 n. 2

(Tex.App.-Houston [14th Dist.] 2003, no pet.).

## III. CAUSATION

### A. The FELA Causation Standard

■■■ Under FELA, every railroad engaging in interstate commerce is liable in damages to any employee injured during his employment when such injury results in whole or in part from the railroad's negligence or by reason of any defect or insufficiency due to its negligence. *See* 45 U.S.C. § 51 (1988). Plaintiffs must prove the common-law elements of negligence, duty, breach, foreseeability and cause-in-fact; however, under FELA, the plaintiff carries only a slight burden on causation. *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 168 (Tex.2002). Accordingly, the test of causation is whether the proof justifies, within reason, the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which the claimant seeks damages. *Rogers v. Missouri Pacific Ry.,* 352 U.S. 500, 507, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957).

### B. Necessity of Expert Testimony

■■■ Despite the lower burden under FELA, a plaintiff still bears the burden of presenting evidence from which a jury could conclude the existence of a probable or likely causal relationship as opposed to merely a possible one. *Edmonds v. Illinois Cent. Gulf R.R. Co.,* 910 F.2d 1284, 1288 (5th Cir.1990). The causal link between an event sued upon and the plaintiffs' injuries must be shown by competent evidence. *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 731 (Tex.1984). Lay testimony will suffice when general experience and common sense will enable a lay person fairly to determine the causal connection. *Praytor v. Ford Motor Co.,* 97 S.W.3d 237, 241 (Tex.App.-Houston [14th

Dist.] 2002, no pet.). The existence of a causal connection between exposure to a certain chemical and injury or disease requires specialized expert knowledge and testimony because such matters are not within the common knowledge of lay persons. *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 893 (Tex.App.-Texarkana 2004, pet. denied). Therefore, in this case in which the plaintiffs have alleged that exposure to creosote caused their diseases, expert testimony is required to enable lay persons to determine whether the exposure caused the disease.

## C. Reliability of Expert Testimony

 Despite the fact that appellants assert a claim under the federal statute, the trial court must follow state procedure in determining the reliability of expert testimony. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). To be admissible into evidence, an expert witness's testimony must, among other things, be reliable. *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 565 (Tex.1995). In *Robinson*, the Texas Supreme Court set forth a two-part test governing the admissibility of expert testimony: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *Id.* at 556. Expert testimony is unreliable if: (1) it is not grounded in the methods and procedures of science and is thus no more than subjective belief or unsupported speculation; or (2) there is too great an analytical gap between the data upon which the expert relies and the opinion he offers. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006). The purpose of the reliability determination is not to decide whether the expert's conclusions are correct, but only whether the analysis used to reach them is reliable. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex.2002).

## D. Expert Testimony under the FELA Causation Standard

### 1. Federal Authority

Appellants rely on *Hines v. Consolidated Rail Corp.*, 926 F.2d 262 (3rd Cir.1991), to validate their expert's testimony. In that opinion, the Third Circuit opined that causation under FELA is broadly interpreted and that "a medical expert can testify that there was more than one potential cause of a plaintiff's condition." *Id.* at 268. The court further concluded that a trial court is justified in withdrawing issues from the jury's consideration only in those rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of the employee. *Id.*, citing *Pehowic v. Erie L.R.R.*, 430 F.2d 697, 699–700 (3rd Cir.1970). The *Hines* court found that by enacting FELA, Congress desired to "secure jury determinations in a larger proportion of cases than would be true of ordinary common law actions." 926 F.2d at 269, quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 371 (5th Cir.1969), *overruled on other grounds, Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 336 (5th Cir. 1997). The court further held that the standard of causation under FELA can significantly influence a determination of the admissibility of an expert's testimony. 926 F.2d at 269. Thus, the court in *Hines* found that FELA's liberal standard of causation required the admission of evidence that might have been excluded in a non-FELA case. *See id.*

Two years after *Hines*, the Supreme Court issued *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding the reliability of expert testimony. In *Robinson*, the Texas Supreme Court adopted the *Daubert* standards for assess-

ing the reliability of expert testimony. 923 S.W.2d at 557. Several federal courts have addressed the tension between the *Daubert/Robinson* standard of admission of expert testimony and the FELA standard on causation for submission of a case to a jury. Those courts have found that the standard of causation under FELA and the standards of admission of expert testimony under the rules of evidence are distinct issues and do not affect each other. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3rd Cir.1994); *Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 503 (9th Cir.1994); *In re Conrail Toxic Tort Fela Litig.*, No. CIV. A 94–11J, Civ. A 94–4J, 1998 WL 465897 (W.D.Pa. Aug.4, 1998) (not released for publication).

 The lower burden under FELA does not mean that, in FELA cases, courts must permit expert testimony that would not be admissible in other contexts. *Claar*, 29 F.3d at 503. Despite the lower causation standard under FELA, plaintiffs must still demonstrate some causal connection between a defendant's negligence and their injuries. *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 964 (6th Cir. 1990); *Edmonds*, 910 F.2d at 1288. In a FELA case, the *Daubert/Robinson* standard of admissibility extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case. *In re Paoli*, 35 F.3d at 743. As long as a FELA plaintiff's expert presents scientifically reliable evidence that the toxic exposure could have played some role, however small, in causing the plaintiff's injuries, the testimony should be admitted under the FELA standard. *Savage v. Union Pac.*

*R.R. Co.*, 67 F.Supp.2d 1021, 1028 (E.D. Arkansas 1999).

### 2. State Authority

At least two Texas Courts of Appeals have addressed the issue of the application of *Robinson* and *Havner* to the relaxed FELA causation standard. *See Missouri Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 750–51 (Tex.App.-San Antonio 2002, no pet.); *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 610 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).[2] In *Navarro*, the San Antonio Court of Appeals, recognizing FELA's "featherweight" burden of proof, distinguished the concepts of burden of proof from admissibility of evidence. It held that the lower FELA burden "has not been generally applied to the admissibility of expert testimony." *Navarro*, 90 S.W.3d at 751. This conceptual distinction is described as follows: "In [a] FELA case, the *Daubert* standard of admissibility of expert evidence 'extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.' " *Id.*

In *Anderson*, the First Court of Appeals also addressed the admissibility of expert testimony under the "featherweight" causation standard. In that case, the court held that the causation standard under FELA and the Jones Act cannot transform no evidence into some evidence. *Id.* at 610. The majority opinion noted that in determining admissibility of expert testimony, the proper focus is not on the causation burden of proof, but on whether the expert opinion testimony is reliable "in the first place." *Id.* Therefore, if the expert testimony is unreliable under *Havner* and

**2.** *Anderson* was a case brought under the Jones Act, which expressly incorporates the relaxed FELA causation standard. *See American Dredging Co. v. Miller*, 510 U.S. 443, 456,

114 S.Ct. 981, 127 L.Ed.2d 285 (1994); *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 657 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

*Robinson*, it is no evidence, "not even a feather's weight." *Id.*

Appellants contend that the trial court improperly applied *Havner* to require a higher level of scientific proof than is required in FELA cases. They partially rely on the *Navarro* concurrence, in which one justice lamented that the precedent the courts of appeals must follow fails to consider the special burden of proof that a plaintiff must bear in a FELA action. We note that the primary case cited in the concurrence, *Hines*, was decided before *Daubert* and *Robinson*, that is to say, before the establishment of standards for admissibility of expert testimony. Therefore, we do not find *Hines* to be persuasive. Moreover, the accepted distinction between burden of proof and admissibility of evidence defeats appellant's argument that we are improperly applying *Havner*.

**E. Does Dr. Dahlgren's Opinion Present Scientifically Reliable Evidence that Appellants' Exposure to Creosote Played Some Role in Causing Their Injuries?**

In his affidavit, Dr. Dahlgren states that he is a medical doctor with board certification in internal medicine and has over thirty years' experience in occupational and environmental toxicology. He is of the opinion that Mr. Duncan's throat and lung cancers were caused by exposure to coal tar creosote while working at appellee's wood treatment plant. Dr. Dahlgren states he based his opinion on coal tar and creosote studies because both substances contain polycyclic aromatic hydrocarbons (PAHs) in different concentrations. He relied on scientific and medical literature revealing that cigarette smoke contains PAHs and that cigarette smokers are at risk for throat and lung cancer due to PAH exposure.

Dr. Dahlgren reviewed the medical records of all plaintiffs, the health records of nearly all of the plaintiffs, each of the plaintiffs' answers to interrogatories, and the depositions of those plaintiffs that were taken. Dr. Dahlgren opined:

Assuming regular daily exposure to the creosote material on the skin and through breathing the vapors for at least the equivalent of one work year, the above-referenced evidence together supports my opinion that plaintiffs' claimed cancers and non-malignant respiratory, skin, and neurological diseases were caused at least in part by their chronic exposure to the toxic creosote. It is my professional opinion that plaintiffs' claimed cancers and non-malignant respiratory, skin, and neurological diseases were caused at least in part by their chronic exposure to the toxic creosote.

Dr. Dahlgren concluded that, "[t]he evidence that coal tar creosote is a carcinogen is not ambiguous. No serious scientist would question that the main ingredient in creosote (PAHs) are [sic] carcinogenic." Dr. Dahlgren specifically relied on studies conducted by the Environmental Protection Agency ("EPA"), the National Creosote Council, the United States Agency for Toxic Substances and Disease Registry ("ATSDR"), the National Institute of Safety and Health ("NIOSH"), and the International Agency for Research on Cancer ("IARC"). Dr. Dahlgren further reviewed epidemiological studies published in the *Scandinavian Journal of Worker and Environmental Health* and the *Journal of Occupational Health*. Finally, Dr. Dahlgren relied on his own study conducted on residents living next to a wood treatment plant.

Appellee contends that Dr. Dahlgren's causation opinion is flawed because he did not demonstrate knowledge

as to the amount of exposure each of the plaintiffs had to creosote. Knowledge of the extent of exposure to a potentially harmful substance is essential to any reliable expert opinion that the particular substance caused a disease. *See Savage,* 67 F.Supp.2d at 1031. To carry the burden of proving a plaintiff's injury was caused by exposure to a specific substance, the plaintiff must demonstrate the levels of exposure hazardous to human beings generally as well as the plaintiff's actual level of exposure. *Austin v. Kerr–McGee Refining Corp.,* 25 S.W.3d 280, 292 (Tex. App.-Texarkana 2000, no pet.).

In attempting to determine specific exposure levels, Dr. Dahlgren referred to the Creosote Council Study of 2001 and the 2003 EPA document. The Council study was conducted to determine the exposure to creosote of workers applying creosote end use products to wood poles and railroad ties. The test subjects were divided into treatment plant job categories. Creosote skin and inhalation exposure was measured based on an eight-hour work day by plant worker category. The EPA relied on the exposure data in the Creosote Council report and gave descriptions of the job categories relied on by the Creosote Council report. The EPA report stated that the EPA determined there are potential exposures to mixers, loaders, applicators, and other handlers during typical use-patterns associated with creosote and from use in commercial and industrial settings. The EPA reported that "Creosote is rated as a B1 probable human carcinogen based on limited evidence of the association between occupational creosote contact and subsequent tumor formation." The EPA concluded that, "Cancer risks for all handler scenarios exceed the level of concern ... for occupational handlers."

In his deposition, Dr. Dahlgren testified that he could extrapolate from those studies the level of exposure for the plaintiffs in this lawsuit. Dr. Dahlgren testified as follows:

Q. So in determining exposure levels, you referred to the 2003 EPA document when forming your—when determining what the exposure levels were for the Abraham plaintiffs?

A. Yes. We can—

\* \* \* \* \* \*

[Dr. Dahlgren]: We can extrapolate from those studies to what was going on with the workers in this Houston wood treatment plant that are the subject of this lawsuit.

Q. And did you perform an extrapolation from the 2003 EPA document?

\* \* \* \* \* \*

[Dr. Dahlgren]: I think I just stated that I did.

Q. Did you—do you have any notes that reflect the extrapolation—

\* \* \* \* \* \*

Q.—that you conducted?

[Dr. Dahlgren]: I didn't take any notes.

Q. What type of extrapolation did you perform?

A. I've already stated that we looked at those—the paper published by—or the EPA document which reflects the Creosote Council study, and we compared the results of those studies to our workers.

And the way we did that is by pointing out the deposition testimony where they describe their exposures as becoming wet with creosote on their clothing, touching the creosote freshly treated wood, touching the actual creosote oil, getting it on their person, breathing the vapors from the exposures. All of those

things reflect a dose of exposure that those people had.

And in terms of quantifying it, we can say that the Creosote Council study would have been similar.

But as I've also modified, they probably had higher exposures in the workers subject to this study than were even reflected in the Creosote Council studies because of what they stated in their study, which is that exposures these days are lower than they would have been in prior decades.

 Even if the EPA study coupled with the Creosote Council study and the other studies reviewed by Dr. Dahlgren could be considered reliable evidence that creosote exposure at certain levels causes disease in human beings generally, appellants have not produced reliable evidence that they were exposed to those levels of creosote. The EPA study found an increased risk of cancer for all workers categorized as "handlers." [3] The study did not address office personnel and workers in non-treating areas because the Creosote Council found that those workers "are far less likely to be exposed to creosote than are those workers who are directly involved in the treatment process." Appellants have presented no evidence as to which plaintiffs may fall into certain worker categories.

Appellants prepared a chart listing each of the plaintiffs, their age, level of exposure, illness summary, and illness category. Under the column entitled, "Exposure Rating," each individual's exposure is given a value of low, medium, or high, and his or her years of employment with the railroad company are listed. No job categories are listed in the chart. Appellants

contend that in preparing the chart Dr. Dahlgren reviewed the plaintiffs' interrogatories and used their job categories to extrapolate the level of exposure. However, Dr. Dahlgren admitted he took no notes of this extrapolation. Appellants did not attach the interrogatories or depositions to their response to motion for summary judgment in the trial court. Therefore, appellants produced no evidence from which the trial court could determine whether appellants were exposed to similar levels of creosote that led the EPA to find an increased risk of disease.

 A plaintiff must prove the level of exposure using techniques subject to objective, independent validation in the scientific community. *See Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998). Scientific knowledge of the harmful level of exposure to a chemical plus knowledge that the plaintiffs were exposed to such quantities are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case. *Allen v. Pennsylvania Engineering Corp.,* 102 F.3d 194, 199 (5th Cir.1996). Appellants need not produce a mathematically precise table equating levels of exposure with levels of harm to show that they were exposed to toxic levels of creosote, but they must produce evidence from which a reasonable person could conclude that their exposure probably caused their injuries. *See Bonner v. ISP Technologies, Inc.,* 259 F.3d 924, 928 (8th Cir.2001). Appellants must show that they were exposed to creosote and that their exposure was equal to or greater than the exposure in the studies on which they rely. *Navarro,* 90 S.W.3d at 755–56.

*Exxon Corp. v. Makofski,* 116 S.W.3d 176, 188 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

---

3. A governmental agency finding that exposure to a substance increases the risk of disease cannot generally be considered as reliable evidence of causation in a tort case. *See*

In *Navarro*, the plaintiff's expert, as in this case, based calculations of exposure on job categories. *Id.* at 756. In that case, the expert relied on only one study that classified each job category with specific numerical values of exposure to diesel exhaust. *Id.* The court found that the expert's testimony was not reliable because he used measurements different from those used in the study and he compared the plaintiff's exposure level to those of workers in the study who held different jobs than the plaintiff. *Id.*

In this case, as in *Navarro*, the plaintiffs' expert relied on only one study that classified job categories and the level of exposure that correlated with each job category. Unlike the expert in *Navarro*, however, Dr. Dahlgren did not provide the trial court with the information it needed to test his opinions. Dr. Dahlgren did not, in his affidavit, or in his deposition, correlate the plaintiffs with the job categories listed in the EPA study. Dr. Dahlgren merely assigns each plaintiff an exposure rating based on length of employment. We can find no evidence of whether each of the 293 plaintiffs were clerical workers, mixers, loaders, applicators, etc. Even assuming this to be the most precise conclusion that can be drawn from the limited data available, such indefinite measurements of exposure are subject to a wide variance and largely open to speculation.

Appellants rely on the Fourth Circuit's opinion in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir.1999) for the proposition that specific exposure levels are not required for a reliable expert medical causation opinion. The expert in that case relied on a differential diagnosis to opine that the plaintiff's exposure to airborne talc caused the aggravation of a pre-existing sinus condition. The defendant moved to exclude the opinion because the expert "had no means of assessing what

level of exposure was adequate to produce the sinus irritation Westberry experienced." *Id.* at 263. The court rejected the defendant's argument based on the plaintiff's testimony that he was exposed to very high levels of talc. *Id.* at 264. The plaintiff in *Westberry* testified that when he removed gaskets from shipping boxes, the gaskets, which were black, had so much talc on them that they appeared to be white or gray. Talc was released into the air as he worked with the gaskets; at the close of the workday, plaintiff was required to blow off his work area, stirring up all the talc that had fallen during the day. *Id.* The court found this testimony was sufficient to permit the trial court to conclude that the plaintiff was exposed to high levels of airborne talc. *Id.*

Unlike the plaintiff in *Westberry*, the plaintiffs in this case have not produced sufficient evidence of their levels of exposure. Appellants argue they presented similar evidence in their depositions when they describe their exposures as "becoming wet with creosote on their clothing, touching the creosote freshly treated wood, touching the actual creosote oil, getting it on their person, breathing the vapors from the exposures." In Dr. Dahgren's opinion, all the plaintiffs had "prolonged" exposure over a period of at least one year. However, plaintiffs have produced no scientific data showing that the extent and nature of their creosote exposure is the same or similar to the exposure necessary to promote the development of disease. For this reason, Dr. Dahlgren's opinions do not meet the reliability standards under *Daubert* and *Robinson*.

Considering the evidence in a light most favorable to appellants, we find they have failed to produce evidence that their exposure was equal to or greater than the exposure in the studies on which they rely.

There is no reliable scientific evidence to connect appellants' exposure to creosote to appellants' injuries other than the unsupported assertion of Dr. Dahlgren. Appellants' evidence, therefore, cannot withstand appellee's no-evidence challenge.

Accordingly, the judgment of the trial court is affirmed.

## APPENDIX

### LIST OF APPELLANTS

Clarence Abraham; Delois Abraham, as Personal Representative and/or as a statutory heir of the Estate of Dalton Abraham, Deceased; Milton J. Abraham; Alvin Alexander; Caffery Alexander; Cliffton J. Alexander; Clovis Alexander; Ernest Alexander; Ernest J. Alexander; Lionel J. Alexander; Melton Alexander; Norris Alexander, Patrick Alexander; Russell J. Alexander; Shelton Alexander; Wilbert J. Alexander; Paul J. Alfred; Gabriel Almeida; Domingo Alonso; Leo D. Anderson; Olivia Anderson, as Personal Representative and/or as a statutory heir of the Estate of Orise Anderson, Deceased; Charles Arceneaux, as Personal Representative and/or as a statutory heir of the Estate of Wilton J. Arceneaux, Deceased; Charles Arceneaux; Stanford Archie; John W. Arnold Jr.; Freddie L. Arthur; Michael E. Artzt; Helen Mack, as Personal Representative and/or as a statutory heir of the Estate of Willie Austin, Deceased; Danny Baisey; Leroy J. Baptiste; Carroll J, Barber; Darrell Barber; Harold Barber, Jr., as Personal Representative and/or as a statutory heir of the Estate of Harold Barber, Deceased; Ronald Bass; Herbert Batiste; Jewel Bennett; Jacqueline Y. Bernard; Harvey Black; Horace G. Black; Louis C, Black; Franck C. Blake; Nolton J. Blanchard; Mildred Bland, as Personal Representative and/or as a statutory heir of the Estate of Vernon Bland, Deceased; Jessie Baton, Jr.; Rodney D. Baton; Ay

Burford, Jr., Joseph H. Bonin; Jimmy Boykin; Vicki Lounge, as Personal Representative and/or as a statutory heir of the Estate of Thomas B. Brannon, Deceased; William R Brazzil; Marvin Britton; Eugene Brown; Ronald Brown; Leslie Bryan; Curtis Bryant; Richard C Bryant; Keith A. Burley; Fred A. Burton; Lloyd D. Busby, Christopher A, Bush, Herbert Bushnell, as Personal Representative and/or as a statutory heir of the Estate of Edwin Bushnell, Deceased; Herbert Bushuell; Dean Bullara; Lee R, Calais; August R. Caldwell; Sorney Calvert; Alfonso Cardenas, Jr., Charles Carmouche; Rafael Casanova, Jr.; Rudolph Castaneda; Clarence Celestine; Kenneth Charles; Michael A. Charles, Anna M. Charles, as Personal Representative and/or as a statutory heir of the Estate of Russell E Charles, Sr., Deceased; John F. Citizen; Jerome Clark; William M. Coleman; Johnnie W Colvin; Phillip Comeaux, Robert Comeaux, Alton Cormier; Delbert Courtney; Bernard Cramer; Elton Crawford, as Personal Representative and/or as a statutory heir of the Estate of Alton Crawford, Deceased; Elton Crawford; John D. Cross; Stephen M. Currie; Leonard Curry; Darryl Davis; Willie P Davis; Jamesetta Davis, as Personal Representative and/or as a statutory heir of the Estate of Albert Davis, Sr., Deceased; Robert J. Deese; Charles E. Dennis; Joseph Derouselle; Eugene Drain; Paul Dumas, Jr.; Mary Duncan, as Personal Representative and/or as a statutory heir of the Estate of Leslie Duncan, Deceased; Diane Eaglin, as Personal Representative and/or as a statutory heir of the Estate of Robert Eaglin, Deceased; Earl Ellis, as Personal Representative and/or as a statutory heir of the Estate of Leroy J. Ellis, Jr., Deceased; Earl J. Ellis; Robert D. Ervin; Guadalupe Escochea, Jr; Daley Etienne; Alfred D. Fields; Rita Filmore, as Personal Representative

and/or as a statutory heir of the Estate of Sterling Filmore, Deceased; Reginald B. Fitzgerald; W.G. Foehr; Bobbie Martin, as Personal Representative and/or as a statutory heir of the Estate of Raymond L Ford, Deceased; Manuel Fraga; Harold J. Francis, Carlton Franklin, as Personal Representative and/or as a statutory heir of the Estate of George Franklin, Deceased; Ted Frazier, as Personal Representative and/or as a statutory heir of the Estate of John Frazier, Deceased; Rodney Freeman; Oliver R. Galloway; Eddie B. Garcia; Jose B. Garcia; Samuel Gardner; Donald R. Gilder; David Gipson; Alma Gobar, as Personal Representative and/or as a statutory heir of the Estate of Whitney Gobar, Deceased; Joseph C. Gollub; Vincente Gomez; Leonard Green; Paul Green; Jose Guerra; Clifton J. Gulliory; Felipe Gusman; Joseph Hall, Jr.; Deborah Harris, as Personal Representative and/or as a statutory heir of the Estate of Fredrick Harris, Deceased; Brenda J. Hawkins, as Personal Representative and/or as a statutory heir of the Estate of Nathaniel W. Hawkins, Deceased; Melvin R. Hayward; Candelario Hernandez; John E. Hollie, Jr.; Mary K. Hooper, as Personal Representative and/or as a statutory heir of the Estate of E.D. Hooper, Deceased; Kenneth W. Hope, Sr.; Shelton D. Hope; Hoover L. Hughes; Ronald W. Hunter; Glen Hutchinson; John Paul Jackson; Lester Janice; Joseph Janice, as Personal Representative and/or as a statutory heir of the Estate of Toney Janice, Deceased; Donnie Jefferson; Roy Jefferson; Bennie E. Johnson; Bernard Johnson; Donald S. Johnson; Jimmy Johnson; Johnny E. Johnson; Larry Johnson; Robert Johnson, Jr.; Robert H. Johnson; Ronnie Johnson; Wallace Johnson; Gilbert J. Jones, Joseph C. Jones; Larry Jones, McAlvin Jones; Willie Jones; Robert W. Joseph, Sr., Charles E. Jr.; Marion R. Kalinwski; Donald R. Keglea; Billy Ray King, Weldon C. King, Jr.; Joseph A. Landry; Andrew H. Law; Otilia LeBlanc, as Personal Representative and/or as a statutory heir of the Estate of Joseph W, LeBlanc, Deceased; Earl R. Lewis; Angela Rucks, as Personal Representative and/or as a statutory heir of the Estate of Isbay R. Lewis, III, Deceased; Joseph D. Lewis, Jr.; Michael Lewis; Samuel Lewis; James L. Lilley; Theresa Lloyd, as Personal Representative and/or as a statutory heir of the Estate of Johnnie Lloyd, Deceased; Earl Love, Jr.; Junius L. Lyons; Glen Marburger; Arnold Diaz Mares; Julian Martinez, Jr.; Victor Mathis; Wilber L. Mathis, Sr.; Lynette Lanear, as Personal Representative and/or as a statutory heir of the Estate of Alexander Mathews, Deceased; Charles E. Matthews; Clarence Mathews, Jr.; Clarence Mathews, Jr., as Personal Representative and/or as a statutory heir of the Estate of Clarence Mathews., Sr., Deceased; Jessie Mayes, Sr.; Wilbert McGilber; John E. McGowan; Lonzo McGrew; Ronald L. McGuire; Billy Ray McKenzie; Ralph E. McKinley; Arthur McKnight; Theodore R. McKnight; Carl Meier; Arvin Mitchell; Ronald J. Morale; Johnny R. Morales, Jr.; Ernesto T. Moreno; Juan F. Moreno; Wayne Moten, Sr.; Charles E. Nash; Charles E. Neal; Merida Newsome; Edward Nixon; Talbert M. North, Jr.; Jose Favian M. Ortjz; Anthony W. Page; A.B. Page; James E. Page; Percy Page; Richard A. Parker; Bobby E. Pelmore; Juan M. Pena; Milton Petties; Rodney C. Pitre; David R. Potter; Frances Prince, as Personal Representative and/or as a statutory heir of the Estate of Earnest Prince, Deceased; Larry W. Prince; Donald G. Quarles, Sr.; Thomas L. Quarles; Elyne Rackel, as Personal Representative and/or as a statutory heir of the Estate of Elmo E. Rackel, Deceased; Jimmy D. Ray; Douglas B. Reynolds; Bonnie Richards, as Personal Representative and/or as a

statutory heir of the Estate of James Richards, Deceased; Dwight B. Richardson; Eugene C. Richardson; Lindall Roark; Jackie C. Robertson; Ignacio Rodriguez; Elmer T. Rogerson; Frances Ross, as Personal Representative and/or as a statutory heir of the Estate of Albert Ross, Deceased; Reberto S. Saldivar; Raymond C. Sauceda; James Savoie; Leon P. Savoy; Douglas W. Scott; Don E. Simmang; Leon Singleton; Elvin Skinner; Gregory H. Smith; Sydney Smith, Jr.; Willie F. Smith, Sr.; Federico Soto, Sr.; Carlton J. Soularie; Cloussy J. Soularie, Jr.; Cloussy Soularie., Sr.; Clarence L. Spann; Ardis Stanley; Anthony W. Stephens; Ricky Stephens; Jerry W. Stickman; Clifford R. Stoot; George Tate; Raymond Tate; Wardell Taylor; Joseph L. Thibodeaux; John H. Thompson; Robert Thompson, Jr.; Michael R. Tillmon, Antonio Torres, Jr.; Alfredo D. Tovar; Richard Tunwar; Kenneth R. Tuttle; Curtis Vanschoubroek; Lois M. Walker, as Personal Representative and/or as a statutory heir of the Estate of British L. Walker, Sr., Deceased; Carolyn Walker, as Personal Representative and/or as a statutory heir of the Estate of Jack P. Walker, Deceased; Jessie Walker, Jr.; Wilburn R. Wallace; Lena Johnson, as Personal Representative and/or as a statutory heir of the Estate of Clifton Washington, Deceased; Lavern Washington; Charles B. Weatherspoon; Jessie James Weeks; Charlotte Currie, as Personal Representative and/or as a statutory heir of the Estate of Richard D. Whisenant, Deceased; Stanley Whitaker; Al J. Williams; Earl H. Williams; Ivory Williams; John H. Williams; Joseph E. Williams; Alfreda Levine–Williams, as Personal Representative and/or as a statutory heir of the Estate of Ronald J, Williams, Deceased; Wallace Williams; Walter Williams, III; Willie D. Williams; Clarence A. Willis; Charles Willridge;

M.T. Wilson, Jr.; Clarence J. Wiltz; Cherie Winfrey, as Personal Representative and/or as a statutory heir of the Estate of Clifford Winfrey, Deceased; Arnett Wrencher; Clifton Wyatt, Sr.; Tilman Zackery, Jr.; Joe D. Zamora; and Clarence Zenon, Jr.