

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**

**FORT WORTH**

### NO. 02-10-00375-CV

BNSF RAILWAY COMPANY                                                    APPELLANT

V.

RONALD NICHOLS                                                              APPELLEE

----------

## FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

This is an appeal from a jury verdict in favor of Ronald Nichols in his

Federal Employer's Liability Act (FELA) suit against BNSF Railway Company.[1]

In three issues, BNSF contends that there is no evidence that Nichols's

degenerative disc disease was caused by getting on and off moving railcars, that

----

[1]During the period relevant to this suit, Nichols worked for the Atchison, Topeka & Santa Fe Railway (the Santa Fe), which in 1995 became BNSF through merger. Thus, all references to Nichols's employer are to BNSF unless stated otherwise.

the trial court erroneously denied BNSF's requested jury instructions on general and specific causation, and that the jury's negligence finding is not supported by the evidence because a cumulative trauma injury was not foreseeable. We affirm.

## Background

Nichols worked as a switchman between 1979 and 1995.[2] A switchman separates railcars from a train coming into the yard and moves them to different tracks based on their ultimate destination. While Nichols was employed as a switchman, he was required to mount and dismount moving railcars about twenty times per day on a slow day, or thirty to thirty-five times on a busy day.[3] He was trained in doing so safely and was provided a rule book describing how to do so. Nichols became an engineer in 1995 and from that time until 2007 no longer mounted and dismounted moving rail cars.

In 2004, Nichols began having knee pain; in conjunction with his treatment, the doctor took a lumbar x-ray of Nichols's spine, which showed no abnormalities. Nichols began having neck and shoulder pain in 2005 and went to see a different doctor in 2006. Because an MRI of his neck showed some disc herniation and degeneration, that doctor prescribed Advil.

---

[2]During 1983–85, Nichols was furloughed and intermittently worked for the company's bridges department instead; he also attended engineer's school, so he was not continuously working as a switchman during the entire period.

[3]Sometimes, Nichols also worked as a brakeman, which involved getting on and off moving railcars, but to a much lesser extent.

In 2007, Nichols began seeing Dr. Dan Eidman for his neck and back pain, and he eventually had surgery to repair the discs in his neck. Nichols stopped working for BNSF that same year; Dr. Eidman had already "pulled [him] out" of work before the surgery.

Nichols sued BNSF under FELA, alleging that he had suffered "cumulative trauma injuries" because of BNSF's negligence in allowing him to "mount and dismount moving equipment." A jury awarded Nichols $1,560,740, including an award of $399,000 for past medical expenses; the trial court granted a motion to exclude the past medical expenses and rendered judgment for Nichols for $1,163,960.[4]

## Causation

In its first issue, BNSF contends that there is no evidence that getting on and off moving equipment (GOOME) caused Nichols's injuries. Included in BNSF's discussion of its first issue is the argument that the testimony of Nichols's expert, Dr. Eidman, was unreliable.

**Applicable Law**

Under FELA, every railroad engaging in interstate commerce is liable in damages to any employee injured during his employment when such injury results in whole or in part from the railroad's negligence or by reason of any defect or insufficiency due to its negligence. *See* 45 U.S.C.A. § 51 (West 1988);

---

[4]The final judgment award includes $2,220 in court costs.

3

*Union Pac. R.R. v. Williams*, 85 S.W.3d 162, 165 (Tex. 2002); *Neloms v. BNSF Ry.*, No. 02-09-00281-CV, 2011 WL 944434, at *1 (Tex. App.—Fort Worth Mar. 17, 2011, no pet.) (mem. op.).  To prevail on a FELA claim, a plaintiff must show that the railroad did not use reasonable care when it could have reasonably foreseen harm.  *Union Pac.*, 85 S.W.3d at 165–66; *Neloms*, 2011 WL 944434, at *2.  The defendant's duty is "measured by what a reasonably prudent person would anticipate as resulting from a particular condition."  *Union Pac.*, 85 S.W.3d at 166 (quoting *Gallick v. Balt. & Ohio R.R.*, 372 U.S. 108, 118, 83 S. Ct. 659, 665–66 (1963)).

The test for causation under FELA is more relaxed than the common law standard.  *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2636 (2011); s*ee Union Pac.*, 85 S.W.3d at 168.  The test of causation under FELA is whether the railroad's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought."  *CSX Transp., Inc.*, 131 S. Ct. at 2636, 2644 (citing *Rogers v. Mo. Pac. R.R.*, 352 U.S. 500, 506, 77 S. Ct. 443, 448 (1957)); *Union Pac.*, 85 S.W.3d at 168; *Neloms*, 2011 WL 944434, at *2.  Despite the lower burden under FELA, a plaintiff still bears the burden of presenting evidence from which a jury could conclude the existence of a probable or likely causal relationship as opposed to merely a possible one.  *Abraham v. Union Pac. R.R.*, 233 S.W.3d 13, 17 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *Edmonds v. Ill. Cent. Gulf R.R.*, 910 F.2d 1284, 1288 (5th Cir. 1990)), *cert. denied*, 522 U.S. 1312 (2008).  The causal link between an event sued upon and

the plaintiffs' injuries must be shown by competent evidence. *Abraham*, 233 S.W.3d at 17.

Although Nichols's claim is pursuant to a federal statute, the trial court must follow state procedure in determining the reliability of expert testimony. *Id.* at 18; *see Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.), *cert. denied*, 525 U.S. 1017 (1998). To be admissible into evidence, an expert witness's testimony must, among other things, be reliable. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 565 (Tex. 1995). The expert must be qualified, and the testimony must be relevant and be based on a reliable foundation. *Id.* at 556. Expert testimony is unreliable if (1) it is not grounded in the methods and procedures of science and is thus no more than subjective belief or unsupported speculation, or (2) there is too great an analytical gap between the data upon which the expert relies and the opinion he offers. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006). The purpose of the reliability determination is not to decide whether the expert's conclusions are correct, but only whether the analysis used to reach them is reliable. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002).

**Evidence**

**Nichols**

During Nichols's testimony, his attorney played a video that showed railroad workers engaged in GOOME that was filmed for Burlington Northern (also a predecessor of BNSF) in 1992. Nichols testified that he did the same

5

thing that the person in the video did. According to Nichols, the step down from the cars to the ballast (the gravel on which the track sits) was "a good" two feet off the ground. Nichols stated that stepping onto ballast was not like stepping onto flat ground and that "[y]ou could twist one way or another like stepping off on a golf ball." Nichols said that he had never been hurt doing so, however. Nichols said that after stepping down, he had to take a few steps, depending on how fast the cars had been moving.

Nichols also testified from a 1992 report admitted into evidence; the report is from an ergonomics manager at Burlington Northern, Bill Barbre. For the report, Barbre analyzed video recordings of workers engaged in GOOME and attempted to estimate the total body forces that would occur during GOOME at different speeds. Nichols testified that he had stepped off moving cars at as much as ten miles per hour, which is higher than the eight miles per hour maximum that Barbre used for his calculations.[5] Nichols testified from a chart attached to the report that total forces on a body from getting off a moving car at four miles per hour were 8.8 times a person's body weight, at six miles per hour were 11.2 times a person's body weight, and at eight miles per hour were fifteen times a person's body weight.[6] Barbre characterized the total body forces of

_____

[5]The maximum speed at the Temple yard where Nichols worked was ten miles per hour, so Nichols did not GOOME at speeds higher than ten miles per hour.

[6]The chart also shows that total body forces from getting off stopped equipment was 5.2 times a person's body weight.

fifteen times a person's body weight at eight miles per hour as "extreme." For a two hundred pound man, this would amount to three thousand pounds of total body force.

Although the Santa Fe stopped GOOME in 1993, Nichols testified that the practice did not cease in the Temple yard where he worked until 1995. According to Nichols, production slowed when the practice was stopped in 1995; he did not believe the practice was allowed so long for the convenience of the workers but to speed up production. Nichols testified that although the Santa Fe Middle Division issued a safety circular in 1988 stating that "[g]etting on or off moving equipment should be avoided whenever possible," the Temple yard was not included in that division, and the Temple yard did not prohibit or discourage GOOME until 1995.[7]

**Lawrence Fleischer**

Lawrence Fleischer, the BNSF corporate representative and an ergonomist, testified that the only company document he could find regarding why GOOME was stopped was a notice to employees from the Chairman, President, and CEO Jerry Grinstein and the Executive Vice President of Operations Jack Chain that the company (Burlington Northern at the time) was

---

[7]BNSF admitted into evidence a 1993 rules pamphlet from the Santa Fe indicating that GOOME was prohibited except as allowed by Operating Circular or in cases of emergency. According to Nichols, an Operating Circular either was or may have been issued for the Temple yard extending the practice of GOOME there until 1995.

ceasing the practice of GOOME for safety reasons. The notice says that Burlington Northern is ceasing the practice of GOOME because it is an inherently dangerous work practice. But Fleischer testified that GOOME is not inherently dangerous. Fleischer was familiar with an Association of American Railroads[8] study showing that during 1979–86, getting on and off equipment was the main cause of lost-time injuries to railway workers. However, Fleischer clarified that the report does not specify whether the injuries were acute or cumulative trauma injuries. Moreover, Fleischer said that it is hard to tell whether a chart in the report showing injuries occurring from mounting and dismounting equipment applies to moving or stopped equipment, or both.

According to Fleischer, the Barbre study was initiated to convince the railyard workers of the wisdom of discontinuing GOOME. Fleischer said that his problem with the Barbre study was that Barbre did not take into account that the men getting on and off moving railcars were still hanging onto the cars by their arms so that the total body force would not be distributed solely on the lower body.[9] Fleischer testified that he spoke with Barbre, and all of the injuries that were discussed in the report were acute, not cumulative trauma, injuries. The report states that Burlington Northern had a fifty to sixty percent reduction in

---

[8]Fleischer agreed that Burlington Northern and the Santa Fe were both members of the AAR, and BNSF is still a member.

[9]Later, however, Fleischer testified that he was not sure whether the study took this fact into account.

accidents from getting on or off equipment within a year after stopping GOOME, which Fleischer says also supports his discussion with Barbre that the events referred to in the report are acute trauma events. Fleischer also agreed that the report showed that forty-three accidents still occurred from GOOME even after equipment was required to be stopped.

Fleischer testified that as a trained ergonomist, when looking for cumulative trauma risk, he would look for an action that would happen repetitively every thirty seconds or so, like the actions performed by a machinist or factory worker. According to Fleischer, GOOME is not the type of high force activity that would cause cumulative trauma. However, he admitted that the cut-off level for just how much force or repetition can cause injury is not known. Fleischer also admitted that as an ergonomist, not a doctor, he could not opine as to what caused Nichols's injuries.

Fleischer testified that he had never seen a study concluding that GOOME causes degenerative disc disease and that the Barbre report is the only study that has tried to calculate the forces involved in GOOME.

**Dr. Dan Eidman**

Dr. Dan Eidman, an orthopedic surgeon who treated Nichols, testified by video deposition. Dr. Eidman performed a cervical fusion on Nichols's neck in November 2007, a lumbar fusion on his low back in June 2008, and surgery to repair Nichols's left rotator cuff in June 2009. In Dr. Eidman's opinion, the injuries necessitating the surgeries were due to repetitive usage. Nichols's

counsel read a definition of cumulative trauma injuries from a 1989 article, *Cumulative Trauma Disorders*, which Dr. Eidman agreed with: "a collective term for syndromes characterized by discomfort and impairment, disability or persistent pain in joints, muscles, tendons and other soft tissues, with or without physical manifestations." According to Dr. Eidman, this definition means that a patient could have symptoms in more than one joint or area of the spine without any "obvious physical findings" on examination. He also stated that a person with the syndrome may have an injury due to repetitive trauma that has yet to manifest itself. Dr. Eidman testified that cumulative trauma disorders have been recognized "for many, many years" and that he had treated them since the beginning of his practice.[10] Dr. Eidman said that cumulative trauma injuries are recognized by the United States government, specifically NIOSH,[11] the National Institute for Occupational Safety and Health.

Nichols's attorney questioned Dr. Eidman about a NIOSH article that describes how to diagnose repetitive trauma injury. Dr. Eidman answered that

> [t]he article indicates that part of the diagnosis would involve evaluating the patient for objective findings on physical examination, subjective symptoms, as well, would be important, and then it goes on to say examples of positive physical findings, include positive

---

[10]At the time of his deposition, Dr. Eidman had been an orthopedic surgeon for thirty years.

[11]NIOSH is the federal agency responsible for conducting research and making recommendations for the prevention of work-related injury and illness and is part of the Centers for Disease Control and Prevention. *Kuiper v. Givaudan, Inc.*, 602 F. Supp. 2d 1036, 1047 n.4 (N.D. Iowa 2009).

maneuvers that are used quite often in our exams in orthopedic examination surgery, as well as any localized physical findings, such as redness or joint deformity or loss of motion.

Nichols's counsel also questioned Dr. Eidman about a 1997 article from the U.S. Department of Health and Human Services, entitled *Musculoskeletal Disorders and Workplace Factors, a Critical Review of Evidence for Work-Related Musculoskeletal Disorders of the Neck, Upper Extremity and Lower Back*.[12] Dr. Eidman agreed with the following statement from the article: "*Musculoskeletal Disorders and Workplace Factors* found that there is evidence for a causal . . . relationship between highly-repetitive work and . . . neck and shoulder musculoskeletal disorders." He also agreed with a second statement from the article: "There is strong evidence that low-back disorders are associated with work-related lifting and forceful movements."

Dr. Eidman testified to treating football players with cumulative trauma injuries. He said he makes his diagnosis in these cases when the person has a history of playing high school or college football, shows up five or ten years later with complaints of neck, back, or shoulder pain, and an MRI shows a tear in the cartilage, meniscus, or ligament. According to Dr. Eidman, "most of those patients do fairly well for several years after their initial injuries, until such time that they've had enough activity to increase the symptoms and aggravate those

---

[12]Although the trial court pre-admitted this article as an exhibit, it is not included in the reporter's record. A note in the index states, "Defendant's Exhibit 33-D was not tendered to the Court Reporter at the time of trial, therefore, was not considered during jury deliberation . . . ."

11

areas." He believed the cause of their injuries was the direct contact and the "running and cutting" they do when playing. Dr. Eidman said such injuries are common in his practice.

Dr. Eidman testified that he had also treated joggers with knee problems that he attributed to constant vibration from running. He had also treated people with tennis elbow due to repetitive use of the elbow combined with wrong technique. Dr. Eidman testified that it is common for people who do heavy lifting and manual labor to sustain back or neck injuries due to the repetitive nature of their work and that he treats quite a few people like that. Dr. Eidman agreed that these people's injuries do not manifest right away but may take quite a while.

Dr. Eidman testified that in his practice, he had treated about one hundred railroad workers with cumulative trauma injuries to their neck or back or shoulder, which he believed were a result of GOOME. Dr. Eidman relied on the 1992 Barbre report in formulating his opinion on causation. According to Dr. Eidman, GOOME at the speeds shown in the video would cause force to a person's lumbar and cervical spine region. Dr. Eidman believed that if a person performed GOOME as shown in the video twenty times a day, over time he would suffer an injury in his lumbar and cervical spine. Dr. Eidman testified that getting on equipment could also cause a rotator cuff injury because the person would have to pull his whole body weight to get on the train. According to Barbre's report, GOOME at eight miles per hour could put more force on a person's body than gymnastic vaulting. In Dr. Eidman's opinion, Nichols's specific activity as a

12

switchman for BNSF—including engaging in GOOME twenty to thirty-five times per day over an approximately fourteen-year period—"would contribute to his symptoms and conditions in the neck and back and shoulder." Dr. Eidman agreed that his opinion would be consistent with the articles referenced in the deposition, which he said he relied on in forming his opinion.

On cross-examination, Dr. Eidman admitted that he had not done any research or studies on cumulative trauma injuries or on GOOME. Dr. Eidman had not read any of Barbre's testimony on the 1992 study, nor had he heard or read anything Lonn Hutcheson—the contractor who actually performed the study—has said about the study. Dr. Eidman did not know whether the Barbre study had been peer reviewed, and he did not know of any peer-reviewed study concluding that GOOME causes cumulative trauma injury. But Dr. Eidman said that it was his understanding that GOOME is generally accepted as causing cumulative trauma because the railroads changed their policies allowing their employees to do it. Dr. Eidman had no opinion or basis for saying how much a person must GOOME before doing so will cause cumulative injury to the neck or shoulders. Dr. Eidman did not know the extent to which the theory that GOOME can cause cumulative trauma injury had been tested, and he agreed that other factors play a part in degenerative disc disease, such as genetics, age, weight, and general physical condition. Dr. Eidman agreed that no studies show degenerative disc disease can result from running and that, in fact, it is generally recognized that exercise such a jogging has a preventative component for

13

diseases such as degenerative disc disease. Dr. Eidman also agreed that he would have expected Nichols's symptoms to manifest themselves before thirteen years had passed.[13]

Dr. Eidman agreed that Nichols had a Type 2 curvature of his acromion,[14] which could have predisposed him to the shoulder problem. He also testified that at least eighty-five percent of people thirty-five or forty and older have degenerative disc disease. He also agreed that there are a lot of unknowns surrounding degenerative disc disease and that the relationship between physical force and degenerative disc disease is unknown. He agreed that there is "zero literature" connecting GOOME to musculoskeletal disorders in general, and degenerative disc disease specifically. Dr. Eidman made no effort to quantify the force to which Nichols was exposed and did not know just how much force would be required to cause his injuries.

Dr. Eidman testified on redirect that he saw probably a couple hundred people who had worked at the railroad and who he thought had problems due to GOOME. When asked whether he knew of evidence that Nichols had any genetic history of degenerative disc disease, he answered, "I don't believe so."

---

[13]Contrary to these calculations, Nichols testified that he ceased work as a switchman in 1995, and he first experienced neck pain in 2005.

[14]The acromion is "[t]he lateral extension of the spine of the scapula [shoulder blade] that projects as a broad flattened process overhanging the glenoid fossa [cavity in the scapula]." Stedman's Medical Dictionary 19, 764, 1725 (28th ed. 2006).

14

According to Dr. Eidman, he would not expect a fifty-year old man to have the type of advanced changes he saw in Nichols's back; Dr. Eidman thinks GOOME accelerated the changes. Dr. Eidman did not think Nichols's weight was a factor in his injury, nor did he have any evidence that Nichols was a runner and could have injured himself that way.

Dr. Eidman testified that Nichols told him his symptoms were worse at work. Nichols had gone to work for the railroad as a young man and never had another job. In Dr. Eidman's opinion, based on his experience as an orthopedic surgeon and on the articles mentioned above, the forces to which Nichols was subjected during GOOME are the cause of his injuries to his back, neck, and shoulders. He explained that the cause of cumulative trauma injury is the amount of force plus the time the force is exerted. Taking those two factors into account with Nichols's testimony, he was likely exposed to about thirty seconds of GOOME per day.

After Nichols's counsel rested, BNSF moved for a directed verdict on no-evidence of causation. The gist of BNSF's argument is that no study supported Dr. Eidman's testimony, Dr. Eidman did not rule out other causes of Nichols's injuries, and Dr. Eidman's opinion is merely based on his ipse dixit testimony. The trial court denied the motion.

**Analysis**

To uphold the jury's verdict on causation, there must be some probative evidence that work such as Nichols performed would play at least a small part in

15

bringing about his injuries. *See Huffman v. Union Pac. R.R.*, 675 F.3d 412, 425 (5th Cir. 2012). Thus, we look for probative evidence that Nichols's degenerative disc disease is the kind of injury than can occur from the railroad's negligently allowing him to GOOME in the course of his work as a switchman. *Id*.

In *Huffman*, the plaintiff contended that his osteoarthritis in the knees was caused by his work as a trainman, which included GOOME. *Id.* The Fifth Circuit panel stated that "[a]t best, there was evidence that the kind of work trainmen did, if not performed properly, could increase the chances of musculoskeletal disorders." *Id*. The fatal flaw in that case was that there was no evidence listing osteoarthritis in the knees as a musculoskeletal disorder that could occur from performing the type of work he did as a trainman.[15] *Id.*

Here, as in *Huffman*, there was probative evidence of the type of work Nichols did and the type of injuries he has. According to BNSF, Nichols was required to also provide evidence of (1) epidemiological studies showing that mounting and dismounting moving railway cars can cause degenerative disc disease and (2) the amount of force Nichols himself experienced when getting on and off moving railcars.

"Cumulative trauma disorder refers not to one specific injury, but to numerous disorders caused by the performance of repetitive work over a long

---

[15]Judge Dennis dissented from the majority opinion, concluding that the doctors' testimony including broad definitions of musculoskeletal disorders was sufficient to support the jury's verdict on causation grounds. *Huffman*, 675 F.3d at 431 (Dennis, J., dissenting).

period of time." *Myers v. Ill. Cent. R.R.*, 629 F.3d 639, 643 (7th Cir. 2010); *Gutierrez v. Excel Corp.*, 106 F.3d 683, 686 (5th Cir. 1997). These types of disorders result from wear and tear on the body, and they can be the product of many factors. *Myers*, 629 F.3d at 643; *Gutierrez*, 106 F.3d at 686.

In determining causation of an injury through differential etiology,[16] the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment. *Myers*, 629 F.3d at 644. There is nothing controversial about that methodology. *Id.*; *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673–74 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 2454 (2011). The question of whether it is reliable under *Daubert* is made on a case-by-case basis, focused on which potential causes should be "ruled in" and which should be "ruled out." *Myers*, 629 F.3d at 644. Calling something a "differential diagnosis" or "differential etiology" does not by itself answer the reliability question but prompts three more: (1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? and (3) Did the expert reliably rule out the rejected causes? If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached. *Tamraz*, 620 F.3d at 674.

---

[16]This term is often also referred to as differential diagnosis. *Myers*, 629 F.3d at 644.

In a FELA case involving lateral epicondylitis (an elbow injury), the First Circuit held that the testimony of an orthopedic surgeon specializing in repetitive stress injuries was reliable when the surgeon had treated the plaintiff, used differential diagnosis to determine causation, had regularly diagnosed repetitive stress injuries, and had treated about 100–150 cases of lateral epicondylitis per year. *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 485–87 (1st Cir. 2010). The court also held that the expert's causation testimony was sufficient to support the jury's verdict for the plaintiff. *Id.* at 487. Similar to this case, the expert had testified that it is well known that repetitive motion causes lateral epicondylitis and that the amount of force and repetition required before injury occurs is unknown. *Id.* at 485. In addition, the expert in that case did not rely on peer-reviewed studies, which the court concluded was not conclusive under *Daubert*. *Id*. at 486 ("The mere fact of publication, or lack thereof, in a peer-reviewed journal is not a determinative factor in assessing the scientific validity of a technique or methodology on which an opinion is premised."); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593, 113 S. Ct. 2786, 2797 (1993) ("Publication (which is but one element of peer review) is not a *sine qua non* of admissibility. . . .").

We believe this case is more similar to *Granfield* than *Huffman*. Dr. Eidman testified that as a thirty-year orthopedic surgeon, he treated many patients with degenerative disc disease, which is caused by repetitious and forceful movements. He ruled out weight, genetics, other activity, and Nichols's

18

general condition; he also testified that age itself was not a factor in that he would not have expected to see the kind of injury he saw with Nichols from a fifty-year-old man.  Thus, we conclude that Dr. Eidman's experience in his practice and the methodology he used to determine causation were sufficient to render his expert opinion testimony reliable and also sufficient to sustain Nichols's burden of proving causation under the standard applicable to FELA cases.[17]  *See Granfield*, 597 F.3d at 485–87; *Hardyman v. Norfolk & W. Ry.*, 243 F.3d 255, 261–67 (6th Cir. 2001); *see also Synar v. Union Pac. R.R.*, No. 12-99-00428-CV, 2001 WL 1263573, at *11 (Tex. App.—Tyler 2001, pet. denied) (not designated for publication) (determining that doctors' testimony that ulnar neuropathy was caused by repetitive use of hands and arms in operating hand brakes and switch equipment was sufficient to prove causation).  We therefore overrule BNSF's first issue.

## Jury Charge

BNSF contends in its second issue that the trial court erred by refusing to include the following instructions on general and specific causation in the jury charge:

---

[17]In contrast to the doctors in *Myers*, Dr. Eidman was well aware of Nichols's history and had reviewed materials, such as the Barbre report and the video showing GOOME, specifically related to the type of work Nichols performed.  629 F.3d at 645.  Additionally, Dr. Eidman's testimony is the type of testimony that was missing in *Lewis v. CSX Transp. Inc.*, 778 F. Supp. 2d 821 (S.D. Ohio 2011), in which the district court granted summary judgment because of a lack of scientific evidence, including studies, linking the plaintiff's carpal tunnel syndrome and his work on a ballast regulator.

In order to establish that exposure to getting on and off moving equipment caused [Nichols's] back, neck and/or shoulder conditions, Plaintiff must prove by reliable scientific evidence that such cumulative exposure generally causes these conditions and that his exposure specifically caused such conditions. . . .

In order to prove specific causation to getting on and off moving equipment, Plaintiff must exclude, with reasonable certainty, other plausible causes of his conditions such as age, genetics, other activities, or no known cause. . . .

Plaintiff must establish [Nichols's] level of exposure using techniques subject to objective, independent validation in the scientific community. He must also prove that such exposure/dose was sufficient to cause his conditions. . . .

The charge here was substantially similar to the charge recently reapproved by the United States Supreme Court, as BNSF acknowledges in its reply brief. *See CSX Transp.*, 131 S. Ct. at 2640–41. Thus, we overrule its second issue.

**Foreseeability**

In its third issue, BNSF argues that there was no or insufficient evidence that GOOME was a defective work practice or that it had a reasonable opportunity to correct it before it caused injury to Nichols. According to BNSF,

Because there is no evidence to this day that GOOME can cause degenerative changes to the cervical or lumbar discs (or could cause a rotator cuff tear over a decade later), [the Santa Fe] could not have known of the possibility when Nichols worked as a switchman from 1979-1995.

Nichols's testimony that he was required to engage in GOOME is evidence that the railroad was aware of the practice; thus, the disputed question is whether the railroad knew or should have known that GOOME created a likelihood that an employee could suffer injuries to the neck, back, and shoulder.

20

Reasonable foreseeability of harm is an essential ingredient of a negligence action under FELA. *CSX Transp.*, 131 S. Ct. at 2643. The jury in such a case must be asked whether the carrier failed to observe "that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances." *Id.* Reasonable foreseeability, then, depends on whether the carrier had a reasonable ground to anticipate that a particular condition would or might result in a mishap and injury. *Id.*; *Union Pac.*, 85 S.W.3d at 166. The test is whether the railroad was or should have been aware of conditions which created a likelihood that the employee would suffer the type of injury he did. *Rogers*, 352 U.S. at 503, 77 S. Ct. at 447; *Union Pac.*, 85 S.W.3d at 166, 169. However, once negligence is proven, the carrier is liable for damages, regardless of whether the full extent of the injury or the manner in which it occurred was probable or foreseeable. *Rogers*, 352 U.S. at 503, 77 S. Ct. at 447; *Union Pac.*, 85 S.W.3d at 166, 169. In other words, "[t]he test of foreseeability does not require that the negligent person should have been able to foresee the injury in the precise form in which it in fact occurred." *E.g.*, *Green v. River Terminal Ry.*, 763 F.2d 805, 808 (6th Cir. 1985). Under FELA, "a tortfeasor must compensate his victim for even the improbable or unexpectedly severe consequences of his wrongful act." *Gallick*, 372 U.S. at 120–21, 83 S. Ct. at 667.

In evidence was a December 1987 AAR Research Report, which shows that AAR was researching how to reduce injuries in railroad workers. The report

21

states that trainmen and yardmen suffered the most injuries and that one of the major causes was "getting on an[d] off cars and locomotives." The report further indicates that AAR was involved that year in providing ergonomic and safety programs for railroads. Specifically, one of the programs assisted in redesigning jobs to minimize the chance for overexertion injuries. This program was primarily aimed at lifting activities, but was "not restricted to lifting" and also applied to "lowering, pushing, and pulling tasks." The report also states about railroad jobs in general that "[t]he chances for injuries from over[]exertion are high in such jobs." The report also addresses force and compression in the lower back as concerns.

Another AAR study was also in evidence, *An Ergonomic Investigation of Railroad Yard Worker Tasks*; it is undated, but it relies on 1986 and 1987 data. A chart attached to the report lists lower extremity injuries, upper extremity strains, and back sprains as typical injury types for mounting and dismounting cars. A contributing factor to such injuries was listed as "[s]peed of train." That study followed a small group of workers in one railyard, who experienced less injuries from mounting and dismounting cars than had been reported nationwide. Even so, those workers reported "that they slipped and fell while mounting or dismounting, suffering strains and sprains of the torso and lower extremities as a result."

Although BNSF's ergonomist testified that GOOME did not involve the kind of rapid repetitive activity that he looked for in considering the cause of cumulative trauma, the jury had evidence to rely on in determining that the railroad should have known that GOOME caused a significant risk of injury to railyard workers, specifically overexertion-type injuries. That there are no studies

specifically linking GOOME and degenerative disc disease does not diminish the evidence that the railroad industry was aware of the types of risks involved in railyard work (and GOOME), that it was working on changing work methods to minimize the occurrence of such injuries, and that those injuries were not limited to acute injuries but included injuries from overexertion. *Cf. Allenbaugh v. BNSF Ry.*, No. CV-09-3086-LRS, 2011 WL 2182430, at *4 (E.D. Wash. June 6, 2011) (denying summary judgment motion because plaintiff produced evidence of foreseeability sufficient to create a fact issue); *Cook v. CSX Transp., Inc.*, 557 F. Supp. 2d 1367, 1373–74 (M.D. Fl. 2008) (same). We overrule BNSF's third issue.

## Conclusion

Having overruled all three of BNSF's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED: June 21, 2012