

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00250-CV

BNSF RAILWAY COMPANY            APPELLANT

V.

JAMES E. PHILLIPS            APPELLEE

----------

### FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION ON REHEARING

----------

Upon consideration of Appellant BNSF Railway Company's motions for rehearing and reconsideration en banc, Appellee James E. Phillips's response, and BNSF's reply, this court denies the motion for reconsideration en banc in a separate order today, and we deny the motion for rehearing. However, we withdraw our prior opinions and judgment of August 1, 2013 and substitute the following.

BNSF appeals from the trial court's judgment following a jury verdict awarding Phillips $1,901,820.85 in damages and court costs on his claims for negligence

under the Federal Employers Liability Act (FELA) and for violation of the Locomotive Inspection Act (LIA). In six issues, BNSF challenges the sufficiency of the evidence to support the jury's verdict, the trial court's exclusion of evidence proffered by BNSF, and the jury charge. Because we hold that (1) the evidence is legally sufficient to support the verdict; (2) the trial court did not abuse its discretion by excluding BNSF's geometry car video, evidence of the absence of the train seats' negative effects on Phillips's coworkers, and general evidence that genetics and heredity can play a role in degenerative spinal conditions; and (3) the trial court did not abuse its discretion in charging the jury, we affirm the trial court's judgment.

## I. Background Facts

Phillips began working for BNSF's predecessor, Atchison, Topeka and Santa Fe Railway, in 1974. At some point, that railway merged with Burlington Northern Railway Company and became BNSF. Phillips continued his employment with BNSF until he resigned in 2005 after a neurologist advised him that he could no longer tolerate the work because of the deterioration of his spinal health.

Phillips sued BNSF on April 13, 2007, asserting that BNSF was negligent under FELA and that it had violated provisions of LIA. Phillips alleged that he had "injur[ies] to his back, neck, legs, shoulders, arms[,] and other body parts." He further alleged that these injuries had been caused by his subjection to "jolts, shocks, vibrations, and cumulative trauma . . . due to defective equipment, including . . . rough riding locomotives, locomotive cab seats that failed to protect

2

[him] from long-term exposure to vibratory forces, and poorly maintained equipment." The jury found

- that BNSF was negligent and that the negligence was the cause of Phillips's injuries;

- that BNSF violated LIA "and/or one or more of the Federal regulations in one or more of the ways alleged by" Phillips;

- that BNSF's violations of federal law were a cause of Phillips's injuries; and

- that Phillips's damages were $1,900,000.00.

The jury also answered "no" to question six, which addressed the three-year limitations period. The trial court rendered a judgment in accordance with the jury's verdict, awarding Phillips damages plus costs for a total recovery of $1,901,820.85.

## II. Three-Year Limitations Period

In its first issue, BNSF argues that the evidence is legally insufficient to support the jury's finding that Phillips filed his FELA claims within three years from the day his cause of action accrued and asserts instead that the evidence conclusively establishes that Phillips did not file his FELA claims within the required time period.

### A. Legal Sufficiency Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere

3

scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[1] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[2]

Anything more than a scintilla of evidence is legally sufficient to support the finding.[3] More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.[4] Any ultimate fact may be proved by circumstantial evidence.[5] A fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case.[6] However, to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a

---

[1] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[2] *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[3] *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

[4] *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

[5] *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993).

[6] *Id.*

scintilla.[7]

**B. Substantive Law**

In 1992, we held,

The limitations period under FELA is three years from the day the cause of action accrued. In a FELA action, compliance with the statute of limitations is a condition precedent to recovery rather than an affirmative defense. The burden is upon the claimant to allege and prove that he filed suit within the three-year period.

In cases of latent injury, the United States Supreme Court has applied the discovery rule to determine when a cause of action accrues. A claimant should reasonably know of his injury when he possesses critical facts of such injury. Moreover, an awareness of critical facts will impose a duty upon a claimant to investigate and confirm or deny his belief, otherwise the limitations period would be meaningless.

The *Kubrick* court held, for limitations purposes, a cause of action accrues when a claimant discovers both his injury and its underlying cause; however, it is not necessary the claimant know the defendant is blameworthy. . . . The *DuBose* court interpreted the *Kubrick* test to implicitly mean a claim accrues when the claimant should reasonably have been aware of the critical facts of injury and causation.

A critical fact causing a claim to accrue can be an event that should put a claimant on notice to check for injury, even if the event results in only minor physical effects. Although the injury may turn out to be more serious than originally thought, the cause of action will nevertheless accrue on the date that a claimant realizes he has sustained harm.

. . . .

*Applying the standard to this case, Billman's cause of action accrued and limitations began running when he knew that he had*

---

[7]*Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995).

5

*suffered a hearing loss which was job related.* Because the summary judgment proof is conclusive that he knew he had suffered a job-related hearing loss more than three years before suing MOPAC, Billman's action for that injury is barred by limitations.[8]

## C. Analysis

We must therefore decide whether the evidence is legally sufficient to show that Phillips's claims accrued no earlier than April 13, 2004. In his petition filed April 13, 2007, Phillips alleged

> [t]hat over the course of his career working for . . . BNSF, [he] was subjected to jolts, shocks, vibrations, and cumulative trauma causing injury to his back, neck, legs, shoulders, arms and other body parts due to defective equipment, including but not limited to, rough riding locomotives, locomotive cab seats that failed to protect [him] from long-term exposure to vibratory forces, and poorly maintained equipment.

On April 8, 1998, Phillips filled out a medical form for a chiropractor complaining of soreness and "[te]nderness up and down [his] spine." He stated that the condition had appeared on April 5, 1998, and recurred "[e]very few months," that it did not get progressively worse, and that he had seen other doctors for it. Phillips stated that "rough riding railroad engines" aggravated his condition, but he also stated that his condition was *not* due to injury or illness arising out of his employment and that he had not missed any work as a result of his condition. Phillips further stated that he had suffered at some point in the past low back pain, neck pain or stiffness, tingling in his hands, legs, and feet, and cramps or backache.

---

[8]*Billman v. Mo. Pac. R.R. Co.*, 825 S.W.2d 525, 526–28 (Tex. App.—Fort Worth 1992, writ denied) (emphasis added) (citations omitted).

The chiropractor noted that Phillips had suffered from "chronic back pain for years" and that his symptoms were "constant in any position" that he was in "when awake."

In August 2003, the chiropractor ordered an MRI to investigate the cause of Phillips's continued symptoms, including "back pain" and "pain down [the] left leg to the left foot." The resulting radiologist consultation report indicated that Phillips had spondylolysis, minor bulging, and intravertebral hemangiomas.

In June 2004, Phillips complained of chronic back spasms and tingling in his fingertips and also reported that "his left foot fe[lt] like ice water." The doctor appeared to connect Phillips's symptoms to his diabetes. Phillips's work was not listed as a cause of any symptoms. The doctor found no gross musculoskeletal abnormalities on inspection, stating that Phillips had a normal gait and no joint swelling or effusion. Approximately one year later, Phillips experienced some numbness and "tingleness" in his fingertips and foot and was referred to a neurologist. Ultimately, in 2005, Phillips was finally "properly diagnosed." The neurologist told Phillips that he "had climbed up the last ladder of a locomotive as of that day." Phillips testified that he was overwhelmed. He elaborated,

> Well, I was not expecting such a hard hit of news. And I knew my career was over and—but I remained optimistic. I thought, Well, I can get a surgery done and possibly go back to work. I really didn't—it really didn't soak in what he—what he said. So I thought, Well, my life has taken a hard right turn. As I went on down that road, I realized that I was immediately—my life was immediately put in reverse and has remained there.

When asked to pinpoint the "very first time that [he] understood that [his] spinal condition was in fact caused by [his] work," Phillips testified,

7

I would have to say that it was prior to—to 2005, possibly, somewhere in there. But I worked and mowed my yard. And I was at work a lot more on locomotives than I was anywhere else. So I realized that that seemed to be where my tenderness and soreness came from.

Phillips testified that "[b]ack in 1998 or 1999 or the early 2000s," he did not know anything about "whole-body vibration" and that he had not been informed by the railroad about any of the scientific literature on the subject. In contrast, his fellow union member, Buddy Blue, testified that members of their union had "been maybe aware" that full body vibration can injure engineers "in the last ten years."

Phillips also testified that his "family had always gone to a chiropractor[,] [n]ot on a regular basis, but as needed." He told the chiropractor that he was a locomotive engineer who rode on rough riding engines. Phillips further testified that the chiropractor's treatments, which he described as about twenty minutes of heat packs followed by adjustments and which he likened to massages, made him feel better and helped his symptoms go away. Phillips testified that he saw the chiropractor from 1998 until 2005 when the neurologist diagnosed him with a spinal condition.

In a footnote to *Billman*, we noted that "[h]ad Billman, in his deposition or affidavit[,] denied rather than admitted that he associated his hearing loss with the loud noises at work, his testimony would be evidence raising a fact issue that precluded summary judgment."[9] We therefore reject BNSF's argument that

---

[9]*Id.* at 528 n.3; see *also Hassell v. Mo. Pac. R.R.*, 880 S.W.2d 39, 44 (Tex. App.—Tyler 1994, writ denied).

"Phillips's self-serving testimony cannot overcome the conclusive contrary evidence produced by BNSF." Further, Phillips's evidence does not need to overcome BNSF's evidence; it merely needs to amount to more than a scintilla.[10] Viewing the evidence in the light most favorable to the jury's verdict, there is some evidence that (1) Phillips, whose family had always seen chiropractors routinely as needed, suffered intermittent back pain that adjustments relieved and experienced tingling and numbness that was initially attributed by doctors to his diabetes, (2) the railroad had not made him aware of the risks of full body vibration and he had no awareness of the risks "back in 1998 or 1999 or the early 2000s," and (3) he reasonably did not realize that his job caused his debilitating injuries until on or after April 13, 2004. Because there is some evidence to support the jury's finding that Phillips filed his FELA claims within three years from the day his cause of action accrued, we overrule BNSF's first issue.

### D. Related Jury Charge Issues

BNSF argues alternatively in its second issue that the trial court erred by refusing (1) to fully instruct the jury regarding Phillips's burden to prove that he filed his FELA claims within three years from the day his cause of action accrued, (2) to place the limitations question first in the jury charge, and (3) to condition the jury's consideration of other questions on an affirmative answer to the limitations question.

---

[10] *See Cazarez*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

9

As the Supreme Court of Texas explained in 2002, in a FELA case, as in other civil cases,

> [a] trial court must submit such instructions and definitions as shall be proper to enable the jury to render a verdict. A party is entitled to a jury question, instruction, or definition if the pleadings and evidence raise an issue. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. Failure to submit an instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct instruction has been requested in writing and tendered by the party complaining of the judgment. A trial court's error in refusing an instruction is reversible if it probably caused the rendition of an improper judgment.[11]

And, as this court discussed in a FELA case in 2011,

> We review a trial court's refusal to include an instruction in the jury charge for an abuse of discretion. The trial court has considerable discretion to determine necessary and proper jury instructions. To establish an abuse of discretion, the requested instruction must be necessary to enable the jury to render a proper verdict so that the trial court's refusal probably caused the rendition of an improper verdict. When a trial court refuses a requested jury instruction, we examine whether the instruction was reasonably necessary to enable the jury to render a proper verdict. Because the jury should not be burdened with surplus instructions, not every correct statement of the law belongs in the jury charge.[12]

The last question of the jury charge, Question No. 6, addresses the limitations issues. It reads,

---

[11] *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (citations and internal quotation marks omitted).

[12] *Neloms v. BNSF Ry. Co.*, No. 02-09-00281-CV, 2011 WL 944434, at *1 (Tex. App.—Fort Worth, Mar. 17, 2011, no pet.) (mem. op.) (citations and internal quotation marks omitted).

Concerning Plaintiff James E. Phillips' claims in this case, did he know, or should he have known, before April 13, 2004 of both the alleged injury and its cause?

*Plaintiff James E. Phillips has the burden of proof to show that he did not know before April 13, 2004 of both the alleged injury and its cause.*

Answer "Yes" or "No[.]"  [Emphasis added.]

BNSF complains that the trial court gave only the first sentence of its proposed instruction to the jury.  In addition to the italicized instruction noted above, BNSF proposed the following instructions for Question No. 6:

It is not necessary that James E. Phillips believed that he had a right to pursue a claim against BNSF Railway Company because of the alleged injury.  All that is required is that James E. Phillips had knowledge of the alleged injury and knowledge of the cause of that injury.  Thus, all that is required is whether James E. Phillips possessed sufficient critical facts from which the alleged injury and its cause, including work-relatedness, should be plainly known.  It is also not required that the full extent of the alleged injury be known.

BNSF's entire proposed instruction was taken from the Texas Pattern Jury Charge for DTPA claims.[13]  BNSF argues that the jury needed the entire proposed instruction

to clarify that "knowledge" in this context means possession of sufficient critical facts—not a full and complete understanding.  Without the full instruction, the jury did not understand that once Phillips possessed sufficient critical facts concerning his injury and its cause, he had a duty to "investigate and confirm or deny his belief," which triggered the FELA's three-year time period within which Phillips had to file his claim.  Thus, the jury received inadequate instruction on a

---

[13] *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges:  Business, Consumer, Employment* PJC 102.23 (2008).

critical, threshold question.

Phillips argues that the proposed instruction would have been repetitive and redundant. We hold that the question as given properly addressed both Phillips's actual knowledge and his duty to inquire by using the "did he know, or should he have known" phraseology,[14] and we further hold that the instruction properly placed the burden of proof on Phillips. Consequently, while BNSF's proposed instruction might have been helpful, we cannot conclude that it was "necessary to enable the jury to render a proper verdict so that the trial court's refusal probably caused the rendition of an improper verdict."[15] We overrule BNSF's first subissue of its second issue.

In the remainder of its second issue, BNSF contends that the trial court erred by failing to place the limitations question first in the jury charge and by failing to make the jury's consideration of the other questions conditional on an answer to the limitations question in Phillips's favor. Even if the trial court did err by not placing the limitations question first in the charge and by not conditioning the jury's consideration of the remaining questions on an answer to the limitations question in

---

[14] *See DuBose v. Kansas City So. Ry. Co.*, 729 F.2d 1026, 1030–31 (5th Cir.) ("The *Kubrick* rule, we think, represents the Court's latest definition of the discovery rule and should be applied in federal cases whenever a plaintiff is not aware of and has no reasonable opportunity to discover the critical facts of his injury and its cause."), *cert. denied*, 469 U.S. 854 (1984).

[15] *See Neloms*, 2011 WL 944434, at *1; *see also* Tex. R. App. P. 44.1(a).

12

Phillips's favor, we cannot say that BNSF has shown harm.[16]  That is, we have already held that legally sufficient evidence supports the jury's finding that Phillips filed his FELA claims within three years from the day his cause of action accrued. BNSF therefore can show no harm in either the sequencing of the questions or the absence of language making the jury's consideration of the remaining questions conditional on their answering the limitations question in Phillips's favor.[17]  We overrule the remainder of BNSF's second issue.

## III.  Sufficiency of Causation Evidence

In its third issue, BNSF contends that the testimony of Phillips's experts Drs. Eckardt Johanning and Tyler Kress is unreliable and therefore legally insufficient to support causation.

### A.  Reliability

BNSF moved to exclude the expert testimony of Johanning on the basis that his opinion on causation lacked reliable foundation data.  BNSF asserted that Johanning had inspected only one locomotive riding on a portion of the track that Phillips rode on and that Johanning "[could] not know the levels of vibration [Phillips] may or may not have been exposed [to], nor [could] he identify a dose/response threshold beyond which vibration will cause injury."  BNSF also objected that

---

[16] *See* Tex. R. App. P. 44.1(a).

[17] *See Thanedar v. Donna Indep. Sch. Dist.*, No. 13-09-00589-CV, 2011 WL 3631954, at *8 (Tex. App.—Corpus Christi Aug. 18, 2011, pet. denied) (mem. op.); *see also* Tex. R. App. 44.1(a).

Johanning's opinions as to the cause of Phillips's "shoulder injury and the practice of getting on and off moving equipment [were] unsupported by any scientific basis and [were] unsupported by any data or references in his Expert Report."

BNSF likewise filed a motion to exclude the testimony of Kress, who has a Ph.D. in engineering with a focus on human factors in ergonomics. BNSF objected to his testimony on the grounds that Kress's "opinions regarding causation are not reliable and are not supported by any underlying facts or data." BNSF contended that there was no evidence that Phillips had exposures similar to those in epidemiological studies and reports on which Kress based his opinions and that Kress's opinions were "mere conclusions and speculation." BNSF preserved its legal sufficiency challenge in its motion for judgment notwithstanding the verdict.[18] We therefore reject Phillips's contentions that BNSF failed to preserve error on its reliability complaints.

As the Supreme Court of Texas has made clear, "a no-evidence review encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable."[19] And, as we explained in a recent FELA case, even though Phillips's claims are pursuant to federal statutes,

> the trial court must follow state procedure in determining the reliability of expert testimony. To be admissible into evidence, an expert

---

[18] *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992).

[19] *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009).

14

witness's testimony must, among other things, be reliable. The expert must be qualified, and the testimony must be relevant and be based on a reliable foundation. Expert testimony is unreliable if (1) it is not grounded in the methods and procedures of science and is thus no more than subjective belief or unsupported speculation, or (2) there is too great an analytical gap between the data upon which the expert relies and the opinion he offers. The purpose of the reliability determination is not to decide whether the expert's conclusions are correct, but only whether the analysis used to reach them is reliable.[20]

### 1. Reliability of Johanning's Testimony

BNSF contends that because none of the epidemiological studies that Johanning relied on to show that exposure to vibration can cause injury were admitted into evidence, there is no basis on which to determine their reliability. But BNSF cites no authority requiring that the studies be admitted into evidence; it is the trial court who determines reliability, not the jury.[21] We therefore reject this argument.

BNSF further argues that Johanning's testimony is insufficient to show that the vibration to which Phillips was exposed caused his injuries and that the testimony is therefore unreliable. Specifically, BNSF argues that Johanning failed to prove that Phillips was exposed to levels greater than or comparable to those that people in the studies were exposed to because Johanning admitted that there is no known dose or exposure level at which injury results. BNSF and the dissent both rely on toxic

---

[20]*BNSF Ry. Co. v. Nichols*, 379 S.W.3d 378, 382 (Tex. App.—Fort Worth 2012, pet. denied) (citations omitted).

[21]*See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

15

tort law, that is, cases involving injuries allegedly caused by a person's exposure to substances, in stating their proposition. But neither BNSF nor the dissent directs us to a case applying that law to a whole body vibration case, nor are we prepared to do so.[22] We therefore reject this argument.

BNSF further contends that Johanning's own testing is no evidence to establish that Phillips was exposed to unsafe levels of vibration and that it is therefore unreliable. Johanning reviewed the following pleadings, documents, and legal records:

(1)     [Phillips's] Petition;

(2)     BNSF's Answer, Affirmative Defenses and Demand for Jury Trial;

(3)     [Phillips]'s Answers to [BNSF]'s Interrogatories;

(4)     [Phillips]'s Responses to [BNSF]'s First Request for Production of Documents;

(5)     BNSF's Answers to [Phillips]'s First Set of Interrogatories;

(6)     BNSF's Responses to [Phillips]'s First Request for Production of Documents;

(7)     Transcript from James E. Phillips'[s] August 8, 2008 deposition;

---

[22]*See Hardyman v. Norfolk W. Ry. Co.*, 243 F.3d 255, 265 (6th Cir. 2001) ("[I]t makes little sense to require a plaintiff to establish a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad brakemen and where the dose/response relationship or threshold level will always vary from individual to individual. Such a requirement essentially would foreclose plaintiffs from recovering . . . against negligent employers unless their particular job has been the subject of a national, epidemiological study . . . .").

16

(8)     Mr. Phillips'[s] X-rays, MRI's, CT's[,] and reports from May 25, 2005 through March 3, 2008;

(9)     CD containing Exhibits #1 through #227 regarding cumulative trauma, repetitive stress and locomotive ride quality;

(10)    Topical Index to Exhibits #1 through #227; and

(11)    Mr. Phillips's medical records.

Johanning also performed a clinical examination of Phillips, ordered lab testing and reviewed the results, and performed a differential diagnostic medical evaluation of him.  As explained by our sister court,

> Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated.  A reliable differential diagnosis typically, though not invariably, is performed after physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests, and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.  This technique has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results.[23]

Johanning further inspected the locomotive ride quality and cab seat of a BNSF train traveling between Belen, New Mexico and Clovis, New Mexico, the same route Phillips traveled when he last worked.  During the inspection, Johanning "obtained representative whole-body vibration (WBV) exposure data and body posture assessment for the operator sitting in the engineer's seat in accordance with

---

[23] *Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 245 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (citations and internal quotation marks omitted).

current applicable technical standards and guidelines (i.e., ISO 2631-1; 1997, etc.) in order to assess occupational WBV exposure and potential health risks." During the inspection, Johanning also evaluated the tested locomotive cab seat for "ergonomic features such as adjustability, posture[,] and suspension quality."

Johanning obtained the WBV exposure measurements, assessed the operator's body posture, and evaluated the cab seat in accordance with internationally-accepted professional and scientific guidelines. The WBV study that Johanning prepared provides a detailed description of the data he obtained and the conclusions he reached, and it was submitted to the trial court as an exhibit to BNSF's motion to exclude Johanning's expert testimony. Likewise, Johanning's clinical medical report containing the differential diagnostic evaluation was also attached to BNSF's motion. Thus, Johanning's medical report on Phillips and the WBV locomotive study were before the trial court when it made its reliability determination. Based on all the above, we cannot say that Johanning's locomotive and cab seat inspection and test coupled with his examination and evaluation of Phillips yielded unreliable evidence.

BNSF also argues that Johanning failed to consider other potential causes and had no articulated basis for ruling out other causes of Phillips's injury. Though BNSF briefly mentions hypertension and diverticulitis in its brief, the alleged potential causes actually discussed by BNSF in any detail in its brief are genetics, diabetes, obesity, and spinal slippage, or spondylosis. We will likewise concentrate our discussion on those four alleged potential causes.

18

BNSF relies on this court's opinion in *Faust v. BNSF Railway Company* for its statement of the rule that "'*if* there are other plausible causes of the injury or condition that could be negated, *the plaintiff must offer evidence excluding those causes with reasonable certainty.*'"[24] This court relied on the Supreme Court of Texas's 1997 *Havner* opinion for that language.[25] But in 2010, also relying on *Havner,* the Supreme Court of Texas refined the rule, stating that "if *evidence* presents 'other plausible causes of the injury or condition that could be negated, the (proponent of the testimony) must offer evidence excluding those causes with reasonable certainty.'"[26] This court implicitly followed this rule in *Faust*, specifically pointing out that the record in that case

> demonstrate[d] that there *was evidence* of other plausible causes of Linda's gastric cancer: H. pylori and cigarette smoking. Peter Shields, M.D., testified for BNSF that H. pylori is an established cause of stomach cancer and that, by itself, it was a substantial cause of Linda's stomach cancer. He also testified that there is a "pretty broad consensus" that smoking can cause stomach cancer and that he could not imagine what evidence someone could review in this case to conclude that smoking was not the cause or a substantial contributor to Linda's stomach cancer.[27]

---

[24]337 S.W.3d 325, 334 (Tex. App.—Fort Worth 2011, pet. denied) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998)).

[25]*Id.*

[26]*Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010) (emphasis added) (quoting *Havner,* 953 S.W.2d at 720).

[27]*Faust*, 337 S.W.3d at 335 (emphasis added).

To be evidence of causation, "an expert opinion must rest in reasonable medical probability."[28]  In arguing in its brief that Johanning failed to articulate a basis for ruling out other causes of Phillips's injury, BNSF relies only on Johanning's conclusory testimony on cross-examination that genetics, diabetes, and spinal slippage generally could be factors in the injuries suffered by Phillips.  Contrary to BNSF's assertions, Johanning never conceded that obesity could be a factor in Phillips's injuries, and BNSF's trial counsel moved to a new topic when Johanning offered to show him (and the jury) "studies that show there's no relationship controlling for other factors including, probably, mass index of obesity, that type of thing."

BNSF relies on no expert testimony of its own in arguing in its brief that evidence of these other alleged potential causes was admitted.  Thus, BNSF does not point to evidence "resting in reasonable medical probability" of those alleged other potential causes.  Consequently, we hold that no evidence triggered any duty on Phillips's part to offer evidence excluding other potential causes of his injuries with reasonable certainty.[29]  Nevertheless, we point out that he did exclude those causes, as shown by Johanning's testimony:

> Q.    Okay.  Would you tell us a little bit about what your examination consisted of, when you did it, et cetera?

---

[28] *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995).

[29] *See Crump*, 330 S.W.3d at 218.

A.    It was a standard physical, comprehensive evaluation, a history taking. I asked Mr. Phillips why he's here, what his issues are, what his problems are. Which treatment—which doctors he had seen, which treatments he had received. What other medical problems he has, other than the back issues that he was talking about as his main complaint. Asked him about family history; past medical history; medication use; smoking history; hobbies; other jobs, other than the locomotive engineer jobs; any jobs he had done; any activities that would require any, you know, forceful lifting, bending, twisting or exposure to vibration.

I reviewed medical records corresponding to what he told me about, you know tests that had been done. X-rays, MRIs, CAT scans and so forth.

Q.    What would your most important findings be with respect to his condition when you saw him?

A.    Well, he reported to me that he had significant neck and lower back pain that affected his extremities, primarily on the right side. He had numbness, tingling, pins and needles pain radiating to the right, mainly in the arms, as well as the leg that occurred over some time period.

That he had seen a doctor for this who referred him to a specialist, who referred him to another specialist. One was a neurologist, someone who looks at nerve problems. Another one, once he diagnosed the nerve issues, referred him to a surgeon to correct the problem.

I looked at his regular doctor notes. You know, Mr. Phillips has hypertension, diabetes, a number of other issues which could play a role, and I—I considered that. And I did what's called a differential diagnosis trying to rule in or rule out other conditions that may present itself as back problems or back pain. Like cancer, inflammatory disease, gout, you know, cirrhosis and so on and so forth.

Q.    Did you take a comprehensive work history from him with respect to all of his work at the railroad?

A.    That's right.

21

Q. And did you get the full information about the number of years and the types of seats and locomotives and areas where he worked?

A. As an occupation physician, I spend a lot of time on this. So I went through that in great detail asking him what jobs did he do, how long did he do it, what his hours are, what locomotive he used, what the seats were. Other workers with similar problems there that he's aware of.

And like I said, you know, it's what is he doing outside of his job. Is he riding horses, or is he a rodeo champ or a paratrooper or whatever, you know, that could play a role. Was he a construction worker, let's say. Was he a trucker. You know, was he jumping out of airplanes for some reason, you know, which could play a role for his particular injury. Which he said he didn't, by the way. Were all negative.

Q. What about some of the other issues that the railroad has raised in this case, if I could ask it. As part of your differential diagnosis, smoking, childhood falls, spondylolysis or spondylolisthesis, diabetes, did you assess and consider those other factors?

. . . .

A. [Y]eah, he has a problem with a protrusion, and I have an example of it on the slide of the lower part of his spine. Maybe genetic, it's not clear. I think that at least now we know that it's a little slippage of the spine with the pelvic bone. Visible now on the X-ray.

He had—what he told me, maybe he was rejected by the Army and I think by the railroad at some point in some medical examination, for some reason he's not sure about. I mean, may be related to this, or it may have been related to some kidney issues he had at the time early on. He's not sure.

So I considered that. It's a minimal slippage. It's a grade one, meaning less than one quarter of the spine size—I mean, the verte—sorry. Vertebrae size. It's very minimal. I don't think it's a competent factor. It's not an issue that required surgery or interfered with any of his job activities early on.

22

Q.    What about diabetes or smoking?

A.    Well, they're two important things.  Smoking, I think, there wasn't anything.  He has quit smoking for several years.  He wasn't such a heavy smoker.  There wasn't any other signs that are typical for smoking, vascular problems.

      He has diabetes, chronic diabetes for several years.  And there, certainly people can have some nerve damage and some vascular issues.  Again, I don't think he has vascular issues related to diabetes.  He may have some, you know, early signs of peripheral neuropathy from diabetes, based on some—one test, but not clinically speaking.  And none of the doctors ever suggested that, except for a neurologist who examined him saying this could be related.  I'm not sure, it may be a factor in it.  But in the final diagnosis, he didn't consider it a competent factor.

Q.    And what about his spine with respect to premature degenerative dis[c] disease, what were your findings?

A.    He has what I would say we typically see in people who have intense vibration exposure for many years.  And if you'll allow me, I think 30 years on the job being a locomotive engineer or conductor or fireman, being up in the cab.  So typically we want to see at least 10 to 15 years, 10 years on a job, you know, to consider it as an occupational issue.  He has double of that.

      He has the problems where we typically would see it in the lumbar spine and the neck.  He also has degenerative, you know, accelerated aging signs in the thoracic spine, meaning the chest.

. . . .

Q.    You've reviewed all of his medical records—

A.    Right.

. . . .

Q.    Did you review his actual MRIs and scans, and do you have those for us?

23

A.    Right.  I have a synopsis of it.  I mean, there are hundreds of pictures, and it's going to take a long time to get them all up—uploaded.  You know, they're all electronic[].  But I have a few of them that I thought shows the—the key issues and messages here.

A.    This is what we—what you tried to say earlier, spondylolisthesis.

Q.    [Plaintiff's Counsel]:  Thank you.

A.    Spondylo- means the spine.  And -listhesis means slippage.  And he had a—what they call grade one.  Not as much as this, actually, he had less, you know, quarter of the, a little slippage there.  Grade four would be all the way out.  You know, and then clearly you get compression there.  That's shown.

       And these the earliest MI found, and it's unfortunately not—not separate cuts.  They're all put together.  It's from 2003.  But it will show you highlights of this.  And these are sagi—sagittal cuts . . . [, m]eaning side cuts.  Then you'll see from the side view, there he is, his spinal canal.  Trust me for that[ i]s the . . . bone, the processing where the other doctor had the needles in.  And up here is the front part of the spine, the vertebrae.

       I show you in more detail.  You know, this is a different year now.  Same spine.  It's Mr. Phillips from 2003.

. . . .

       And for me, what's important is, now how do the vertebra surface look.  How do the dis[cs] look.  And does it affect the spinal cord that's shown back here.  And then a search, and we look at it.

       And you see here, actually, this tiny slippage, the spondylolisthesis that he had, probably all along didn't bother him.  So I don't think, you know, if they did military X-rays in the old days they would exclude someone because, yeah, they shouldn't jump out of airplanes.  You know, that's certainly a risk, you know.  But no one from the railroad subsequently excluded him for any reason, know it was that.

       This is the 2008 [MRI].

24

. . . .

And what's unique for Mr. Phillips here, and it's common in many of these reports, the straightened [neck.] Normally you have a nice shape there. Why is the curve in the spine, this double S curve good? Because when you compress it, you know, a curve element . . . gives in. If it's stiff, a straight stick or whatever will not give in. So the neck doesn't have anything to cushion itself. It's straightened up because of the degenerative effects on the cervical spine that required the surgery.

. . . .

Q.     And in your review of these MRIs and—and scans, did those confirm your diagnosis of premature degenerative dis[c] disease?

A.     That's the results of it, yeah.

. . . .

Q.     . . . Dr. Johanning, based upon all of your training and your experience, based on the occupational history that you took from him, based upon your understanding of the medicine and the review of the scans, do you have an opinion that you can express with reasonable medical probability as to whether or not these injuries, these premature degenerative dis[c] disease changes, herniated and ruptured dis[c]s and spinal cord impingement, were caused by his work for the . . . BNSF railway?

A.     Yes, I believe based on the data I have and my experience and training that the nerve damage he has is a result, in whole or in part, from the exposure and the repeated shocks and jolts that he experienced in 30 years operating locomotives, the way I studied them. And we have documented and other people have described the problems that are in the cabs with the vibration exposure and jolts, yes.

Q.     Dr. Johanning, based upon a reasonable degree of medical probability, do you have an opinion as to whether or not the need for these surgical procedures was likewise caused by his work

25

for the railroad and his overexposure to jolts[,] shocks[,] and whole body vibration?

A.  I think based on my medical knowledge and training, I would say yes. There was a dire need for these type of interventions.

Q.  Would you consider this, in your medical opinion, to be normal aging?

A.  Certainly not. I don't hope that's the norm. No, it's certainly—I mean, someone with so much surgery and deterioration of the spine, I wouldn't expect that. Even if someone has diabetes, high blood pressure, is a smoker, you know, obese or whatever, these are not factors that I think explains any of what we're looking at here.

Q.  And so in your best professional judgment, what would be the factor that explains what happened to Mr. Phillips?

A.  I think it's work exposure. The shocks and jolts; the bad seats; the awkward postures at times; the slack in, slack out, that type of action; the resonance effects; the vector sum results that we . . . saw; the high crest factors. These are indices for exposure. Based on comparative studies now that other people have done with other occupations where they had similar exposures.

. . . .

Q.  And just for the record, all of the opinions that you've just expressed would be to a reasonable degree of medical probability?

A.  Yes.

We reject this argument by BNSF. Having disposed of all BNSF's arguments as to the reliability of Johanning's testimony, we hold that his expert evidence is reliable.

26

## 2. Reliability of Kress's testimony

BNSF argues that as a matter of law, Kress is not qualified to testify to specific causation because he is an ergonomist, not a medical doctor. As our sister court in Tyler explained in a similar case almost twelve years ago,

> [Kress's] education and work are in the areas of biomedical engineering and human factors engineering. His work, including teaching, research, and consulting, involves the application of engineering principles to the human body, focusing on injury prevention. This includes the biomechanical and ergonomical engineering aspects of safety and injury. Synar's suit involved allegations that UP did not provide him with a safe place to work, leading to his repetitive-use injury. Kress could properly testify as to these matters.[30]

Similarly, here, Kress testified that BNSF did not provide reasonable seats, did not reasonably maintain the seats that it did provide, and did not provide Phillips a reasonably safe working environment. Like our sister court, we also conclude that Kress is not precluded from testifying "as to these matters."[31]

BNSF also contends that Kress's testimony is unreliable and therefore no evidence because (1) he relies on epidemiological studies without proving the requisite background needed to render them admissible; (2) he cannot testify to any specific dose/response relationship between vibration and injury; and (3) he did no actual testing in this case to determine the levels of exposure to which Phillips may

---

[30] *Synar v. Union Pac. R. Co.*, No. 12-99-00428-CV, 2001 WL 1263573, at *6 (Tex. App.—Tyler Oct. 17, 2001, pet. denied) (not designated for publication).

[31] *See id.*

have been exposed. We reject BNSF's arguments regarding the necessity of epidemiological studies being admitted into evidence before the jury and of complying with toxic tort caselaw for the same reasons we rejected those arguments when raised against Johanning.[32]

As to BNSF's third argument, that Kress did no actual testing in this case to determine the levels of exposure Phillips experienced and that Kress's testimony is therefore unreliable, an expert does not necessarily have to do his own testing to qualify as an expert. As the Supreme Court of Texas has explained,

> In determining whether expert testimony is reliable, a court may consider the factors set out by the Court in *Robinson* and the expert's experience. However, in very few cases will the evidence be such that the trial court's reliability determination can properly be based only on the experience of a qualified expert to the exclusion of factors such as those set out in *Robinson*, or, on the other hand, properly be based only on factors such as those set out in *Robinson* to the exclusion of considerations based on a qualified expert's experience.[33]

The Supreme Court of Texas explained the parameters of the *Robinson* factors,

> There are many factors that a trial court may consider in making the threshold determination of admissibility under Rule 702. These factors include, but are not limited to:
>
> (1) the extent to which the theory has been or can be tested;
>
> (2) the extent to which the technique relies upon the subjective interpretation of the expert . . . ;

---

[32]S*ee* Tex. R. Evid. 803(18); *Robinson*, 923 S.W.2d at 556.

[33]*Camacho*, 298 S.W.3d at 638 (citations omitted).

28

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique.

We emphasize that the factors mentioned above are non-exclusive. Trial courts may consider other factors which are helpful to determining the reliability of the scientific evidence. The factors a trial court will find helpful in determining whether the underlying theories and techniques of the proffered evidence are scientifically reliable will differ with each particular case.[34]

In Kress's affidavit attached to Phillips's brief opposing BNSF's motion to exclude Kress, Kress explains the foundation for his opinions. In addition to his "review and knowledge about the scientific, engineering, medical[,] and epidemiological literature in regard to the health effects of repeated exposure to whole-body vibrations, shocks[,] and jolts in the seated environment," Kress relied upon pleadings and discovery; Phillips's medical records; photographs and timetables produced by Phillips regarding various locomotives he worked on during his career; photographs Phillips produced of tractor seats with dampening devices; a prior report prepared by Johanning in another case regarding his testing of BNSF locomotive ride quality characteristics and seating evaluation; a prior report prepared by William H. Muzzy in another case titled, "Preliminary Analysis of

---

[34] *Robinson*, 923 S.W.2d at 557.

Locomotive Operator Seats—Condition and Suitability"; an index to ergonomic and medical literature from BNSF's own files that BNSF produced in another case; and other materials from similar cases Kress worked on involving cumulative trauma spinal injuries to BNSF locomotive engineers and conductors, which include many thousands of pages of BNSF internal documents, memoranda, correspondence, complaints and reports from train crew personnel about defective locomotives and seats, locomotive defect reports, and cab seat defect reports produced in those cases.

Although Kress did not conduct a site inspection in this case, he explained in his affidavit that it was unnecessary for him to do so for three important reasons. First, Phillips's injuries are cumulative; they developed over a career spanning more than three decades. Thus, many of the seats and locomotives Phillips formerly utilized would not have been available for inspection at the work site. Further, Kress is very knowledgeable of the locomotives and seats Phillips encountered in his long career because Kress has personally evaluated a large number of BNSF locomotives and cab seats over the course of his career. Finally, Kress had no need to make a site inspection because he already had amassed detailed information about BNSF's locomotives and cab seats used over the last thirty years from his review of the many thousands of pages of internal BNSF documents, memoranda, photographs, correspondence, and complaints, as well as reports from train crew personnel about defective locomotives and defective seats, locomotive

defect reports, and cab seat defect reports produced during discovery in this and prior similar cases he has worked on.

Thus, we hold that Kress's opinions are based on his long experience and "grounded 'in the methods and procedures of science[,]'" not based merely on "subjective belief or unsupported speculation."[35]  Having disposed of BNSF's arguments, we hold that Kress's opinions are reliable.

## B.  Sufficiency of the Evidence

BNSF also argues that even if reliable, the testimony of Johanning and Kress is legally insufficient to support causation.  As we explained in a recent FELA case,

> Under FELA, every railroad engaging in interstate commerce is liable in damages to any employee injured during his employment when such injury results in whole or in part from the railroad's negligence or by reason of any defect or insufficiency due to its negligence.  To prevail on a FELA claim, a plaintiff must show that the railroad did not use reasonable care when it could have reasonably foreseen harm.  The defendant's duty is "measured by what a reasonably prudent person would anticipate as resulting from a particular condition."

> The test for causation under FELA is more relaxed than the common law standard.  The test of causation under FELA is whether the railroad's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." Despite the lower burden under FELA, a plaintiff still bears the burden of presenting evidence from which a jury could conclude the existence of a probable or likely causal relationship as opposed to merely a possible

---

[35] *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 2795 (1993)).

one.  The causal link between an event sued upon and the plaintiffs' injuries must be shown by competent evidence.[36]

As presented above, Johanning testified that in his opinion, Phillips's injuries were caused by his work for the railroad and his overexposure to shocks, jolts, and whole body vibration.  Kress testified,

> Essentially, it's pretty simple when you look at this case.  He's a professional vehicle operator.  That's what—That's what Mr. Phillips does for a living.
>
> And the bottom line is the seated environment in his vehicle is not reasonable and it is a—it is an antiquated design with respect to appropriateness for long-term professional drivers that have to be in that environment.  That's the crux of it.

He also testified,

> Q.    Do you have an opinion, Dr. Kress, with this background, knowledge and information as to whether or not it was reasonable or unreasonable for [BNSF] to provide toadstools, flat backs or seats that amplified the vibration of the human spine?
>
> A.    I do.
>
> Q.    Okay. What is it?
>
> A.    I understand by now I don't think it's reasonable.  Essentially, the seats . . . are—even if you go beyond the toadstool seat, even the seats that are currently used are the types that are—they just have a—literally a pole underneath that mounts the seat pan to the floor, a rigid metal pole, and then —or that pole—metal poles that mount onto the wall.
>
> So it's either like a—you know, like a diving board, so it's all rigid metal that can get loose the way it's affixed or straight to the floor.  There is no mechanical or air suspension in these

---

[36]*Nichols*, 379 S.W.3d at 381–82 (citations omitted).

seats between the seat pan and the floor level, and there's a reasonable opportunity to address jolts and vibration at that level.

Plus, your foams are the types that are the single-density type foams that don't have a very long life. Most of them are only warrantied for about a year and they become flat and ineffective as far as just the foam standpoint too.

. . .—And then there's deficiencies of maintenance and appropriateness in the lumbar curve and the breathability. There's all sorts of ergonomic characteristics. It's just basically not a good seat. It's unreasonable.

. . . .

Q. Have you had the opportunity to look at your own data and Dr. Johanning's data and either Dennis Mitchell's data with respect to the vector sum to make a determination as to whether or not . . . BNSF violated or was not in compliance with the appropriate standards of care?

A. Yes, sir, I have.

Q. And what opinion do you have in that regard, Dr. Kress?

A. If you look at just vibration, again, there are other risk factors. You know, we have transients and jolts and posture influences. If you look at just vibration, in many of the measured values that have been—the data that have been presented here and I've looked at, the vector sums exceed the threshold caution values in the—in the standards that exist.

Q. Okay. Would you have a professional opinion as to whether or not it would be reasonable or unreasonable to allow these particular seats that you're knowledgeable with respect to Mr. Phillips to become into a condition of disrepair?

Is that reasonable or an unreasonable thing to fail to maintain the seats?

A. Well, clearly, that's a simple answer. I mean, it's unreasonable not to appropriately maintain your seats. First of all, you want a

33

reasonable seat in the first place. And then naturally you want to—you want to maintain it and don't let it get into disrepair or having problems with its adjustability and looseness and et cetera.

. . . .

Q. Do you have an opinion, Dr. Kress, as to whether or not the BNSF provided Mr. Phillips with a reasonably safe work environment specifically with respect to this particular nonrisk injury?

A. I do have an opinion.

Q. And what is your opinion?

A. That it's not reasonable. The seats are antiquated. And it's just clear to me from evaluating this, it's a problem.

Because the jury could have concluded from the evidence that BNSF's negligence "played some part" in causing Phillips's injuries, we hold that the evidence of causation is sufficient under the FELA standard. We overrule BNSF's third issue.

## IV. Exclusion of Evidence

BNSF argues in its fourth issue that the trial court improperly restricted BNSF's ability to cross-examine Phillips's witnesses in any meaningful way by erroneously excluding evidence relevant to the causation inquiry—evidence of genetics and heredity, evidence from Phillips's coworkers, and evidence taken from BNSF's geometry car.

In its discussion of the first two categories of excluded evidence, BNSF focuses on the granting of Phillips's motion in limine. A complaint that the trial court

abused its discretion by excluding evidence cannot be predicated on a trial court's ruling on a motion in limine.[37] The granting of a motion in limine is not a ruling on the admissibility of the evidence and does not preserve error.[38] A motion in limine simply prohibits references to specific issues without first obtaining a ruling on the admissibility of those issues outside the presence of the jury.[39]

To preserve error if the motion in limine is granted, during trial the party must (1) approach the bench and ask for a ruling, (2) formally offer the evidence, and (3) obtain a ruling on the offer.[40] If, at that time, the court rules the evidence inadmissible, the party must further preserve the evidence through an offer of proof.[41] An appellate court cannot decide whether evidence was improperly excluded unless the evidence is included in the record for review.[42]

To determine whether an abuse of discretion occurred in the exclusion of evidence, we look to see whether the trial court acted without reference to guiding

---

[37] *Sw. Country Enters., Inc. v. Lucky Lady Oil Co.*, 991 S.W.2d 490, 493 (Tex. App.—Fort Worth 1999, pet. denied).

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at 493–94; *see also* Tex. R. App. P. 33.1(a)(1)(B), 33.2; Tex. R. Evid. 103(a)(2).

[42] *Sw. Country Enters.*, 991 S.W.2d at 494.

principles or rules.[43]  We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably, though not necessarily, caused the rendition of an improper judgment.[44] The complaining party must usually show that the whole case turned on the evidence at issue.[45] If erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful.[46]

We examine the entire record in making this determination of harm.[47]  We evaluate the entire case from voir dire to closing argument, considering the evidence, strengths and weaknesses of the case, and the verdict.[48]  We also consider whether counsel emphasized the erroneous evidence and whether the admission of the evidence was calculated or inadvertent.[49]

---

[43] *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex. 2012) (citing *Robinson*, 923 S.W.2d at 558; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986)).

[44] *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008).

[45] *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995).

[46] *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (op. on reh'g); *Reliance Steel*, 267 S.W.3d at 873.

[47] *Interstate Northborough P'ship*, 66 S.W.3d at 220.

[48] *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 236 (Tex. 2011).

[49] *Id.*

## A. Hereditary or Genetic Factors

BNSF complains that throughout the trial, the trial court erroneously excluded evidence that hereditary or genetic factors could have been the cause of Phillips's injuries. To the extent that BNSF complains of an unfavorable ruling on Phillips's motion in limine, a ruling that we can find nowhere in the record, we hold that it did not preserve error.[50] We further hold that to the extent BNSF complains of the exclusion of evidence that does not appear in its offer of proof, it has not preserved the issue.[51]

But BNSF did preserve error as to the exclusion of evidence by Drs. William Mitchell and Dan Spengler as well as by Johanning.

In BNSF's presentment of its offer of proof of the testimony of Mitchell and Spengler, the following dialogue occurred:

> [Defense Counsel]: . . . . Outside the presence of the jury, the Court granted Plaintiff's motion in limine which prohibited the introduction of evidence concerning the influence of or contribution of genetics toward the development of degenerative dis[c] disease in the cervical, lumbar or thoracic spine. Both Dr. Spengler and Dr. Mitchell, if allowed to testify, would have testified that genetics is a documented contributor to genetic—to degenerative dis[c] disease in the cervical and lumbar spine and thoracic spine such as that found in the Plaintiff. And that Plaintiff's genetic predisposition to gene—degenerative dis[c] disease is, in reasonable medical probability, a cause or contributing cause to Plaintiff's degenerative dis[c] disease in the cervical and lumbar spine.

---

[50] *See Sw. Country Enters.*, 991 S.W.2d at 493.

[51] *See id.* at 493–94; *see also* Tex. R. App. P. 33.1(a)(1)(B), 33.2; Tex. R. Evid. 103(a)(2).

That concludes our offer of proof.

THE COURT:  Are you telling the Court that there has been a finding of genetic predisposition?

[DEFENSE COUNSEL]:  I'm telling—

THE COURT:  It sure sounded like it.

[DEFENSE COUNSEL]:  Okay.  But I'm—

THE COURT:  For the Plaintiff.

[DEFENSE COUNSEL]:  What I'm telling the Court is that the literature supports—there's—

THE COURT:  Everybody knows it, Counsel, which is one of the reasons why I just—I've excluded it.  It's—it's common knowledge.

[DEFENSE COUNSEL]:  Fair enough, but it's common knowledge we would like to reinforce with the—with the jury.  So I'm not saying—

THE COURT:  I'm sure you would.

[DEFENSE COUNSEL]:  I'm not saying that there is a specific genetic finding as to the—

THE COURT:  Well, it sounded like it to me, maybe I didn't—

[DEFENSE COUNSEL]:  Well, I'm sorry—

THE COURT:—hear it.

[DEFENSE COUNSEL]:—for—for that.  I mean, it's certainly our position that the literature supports that it's a factor or— a contributing factor or a contributing cause to the—to the degenerative dis[c] disease as found in the Plaintiff.

In regard to Spengler's video deposition, even though BNSF contends that

Spengler's video deposition testimony concerning the role of genetics and heredity

was excluded and that it preserved its objection, defense counsel's statement to the

38

trial court as provided in the record, together with the notations in the reporter's record, indicates that the jury actually heard that portion of Spengler's testimony. Defense counsel stated to the court, "With regard to . . . Spengler's deposition, *we will be playing that deposition for the jury from page 47, line 21 to the end of the deposition.*" [Emphasis added] The deposition takes only forty-nine pages. The reporter's record recites that the "[v]ideotaped deposition of . . . Spengler, Court Exhibit No. 5, was played for the jury[.]" The recitation does not indicate that any portion of the exhibit was excluded. Moreover, the portion that defense counsel specifically told the trial court that he would play for the jury includes the following exchange:

> [Defense Counsel]: Dr. Spengler, can you tell us what is the role of heredity or genetics in causes of spinal conditions?
>
> [Plaintiff's Counsel]: I don't think this is an accurate time. I'm going to object to that, Counsel, for the sake of the record, for us to be putting something on record. The motion in limine was already ruled on, so—
>
> [Defense Counsel]: And I have to make an offer of proof.
>
> [Plaintiff's Counsel]: If you want to make an offer of proof, I think that that would be a more appropriate subject at some—by briefing schedule.
>
> [Defense Counsel]: The judge instructed us to approach before we asked these questions. I will approach before any of this is played for the jury, I assure you.
>
> [Defense Counsel]: Doctor, can you answer my question?
>
> A.: Yes. I think I—maybe could you repeat it once more so I don't wander and I get right to it?

Q.  What is the role of heredity or genetics in spinal problems?

A.  Well, I think that's—that's what's the exciting part of the new science that's coming of age now. We have a number of excellent studies by Vieteman and Bhatia on identical twins. I think that information is very, very relevant to this case.

They studied twins—identical twins. One of the twins had a very much history of vibratory exposure, exposure to vibration, driver, etc., etc. The other twin had no such exposure and was not so active and so forth. And the interesting thing was is they followed these people along as they aged. There was no change whatsoever in the MRIs of their lumbar spines and their spines in general.

So that—that's a powerful study that suggests where everything is controlled, there's not—these are good studies. These are the best studies we have and they show no relationship. So I think that's—that's important.

And, in fact, the lead article in the Journal of Bone and Joint Surgery this month, which I haven't even totally read but I've reviewed it, shows that there's a big factor of family history linked to a herniated disc, which we knew in animal studies, such as the dachshund. I suppose everybody knows about those little dogs. They have hereditary causes of dis[c] herniations.

And now we're starting to see literature come out linking the same to human disc herniations. So I think there's a lot of excellent data, much better data than we have that [Plaintiff's Counsel] quoted.

Q.  Does that information and data on the role of heredity support your opinion in this case regarding causation in Mr. Phillips' conditions?

A.  Absolutely.

Q.  Do you need to have genetic testing done on Mr. Phillips in order to reach that opinion?

A.  No, No, I don't think—no, no, no, no. I hope I didn't suggest that. I think it's just the—the knowledge that's come out about the

identical twins and these kind of studies is very, very interesting and I think very, very powerful.

Phillips's trial counsel cross-examined Spengler in the videotaped deposition as well:

Q.      Doctor, it's true that you don't know anything about Mr. Phillips' genetic history, do you?

A.      I do not.

Q.      You don't know that his mother and father are long lived and have no spinal disorders whatsoever, do you?

A.      Well, I wouldn't say I didn't know about his father. I knew his father worked for the railroad for many, many years, but I don't know their personal health. And so, yes, I'm not going to discuss their health. I don't know that.

Q.      You don't know anything about his father's spinal health, do you?

A.      All I know is he worked for the railroad, as I said.

Q.      Do you know what craft he worked in for the railroad?

A.      No.

Q.      Do you know anything about his mother's spinal health?

A.      No.

Q.      Do you know anything about his family tree in terms of their spinal health?

A.      No.

Q.      It's true, is it not, Doctor, that the studies by Bhatia and Vieteman were rejected when NIOSH did its comprehensive review of their work after they testified in front of OSHA?

A.      I'm not familiar with that, but it wouldn't surprise me.

> Q. It's true, is it not, that the follow-up studies with Vieteman and Bhatia have, in fact, identified whole body vibration as an independent additive factor for degenerative disc disease?
>
> A. I don't believe that's quite what their work suggested.

We cannot hold that the trial court abused its discretion by excluding Spengler's testimony about the role of genetics and heredity on Phillips's injuries when the record indicates that the jury did in fact hear it.[52] Further, because BNSF gave identical offers of proof for Mitchell and Spengler, even if the trial court had abused its discretion by excluding Mitchell's testimony, which we do not hold,[53] there would be no harm because it is cumulative of Spengler's testimony that the record reflects was in fact heard by the jury.[54]

Finally, in BNSF's offer of proof regarding Johanning, the following dialogue occurred:

> [Defense Counsel]: First, . . . Johanning, you agree, don't you, that a potential cause to the population in general for degeneration of the spine is genetic problems?

---

[52]*See Taveau v. Brendan*, 174 S.W.3d 873, 876–77 (Tex. App.—Eastland 2005, pet. denied) (holding evidentiary issues waived because court could not tell, based on reporter's transcription, where tapes were stopped and started and which parts of tapes were actually heard by jury).

[53]*See Amoco Chems. Corp. v. Stafford*, 663 S.W.2d 147, 150 (Tex. App.—Houston [1st Dist.] 1983, no writ) (holding that trial court properly excluded doctor's testimony that some of plaintiff's symptoms could be associated with alcoholism or alcohol withdrawal when no competent evidence indicated plaintiff was alcoholic or suffered from alcohol withdrawal).

[54]*See Gen. Motors v. Burry*, 203 S.W.3d 514, 545 (Tex. App.—Fort Worth, pet. denied) (op. on reh'g).

A. It's a genetic issue, yes.

As BNSF acknowledges, on direct examination of Johanning, the following evidence

was admitted,

> Q.  [By Phillips's trial counsel]: What about some of the other issues that the railroad has raised in this case, if I could ask it. As part of your differential diagnosis, smoking, childhood falls, spondylolysis or spondylolisthesis, diabetes, did you assess and consider those other factors?
>
> A.  There was a difficult word, right, spondylolisthesis. I know, everyone has problems saying it—
>
> Q.  Spondylo—
>
> A.  —yeah, he has a problem with a protrusion, and I have an example of it on the slide of the lower part of his spine. Maybe genetic, it's not clear. I think that at least now we know that it's a little slippage of the spine with the pelvic bone. Visible now on the X-ray.
>
> He had—what he told me, maybe he was rejected by the Army and I think by the railroad at some point in some medical examination, for some reason he's not sure about. I mean, may be related to this, or it may have been related to some kidney issues he had at the time early on. He's not sure.
>
> So I considered that. It's a minimal slippage. It's a grade one, meaning less than one quarter of the spine size—I mean, the verte—sorry. Vertebrae size. It's very minimal. I don't think it's a competent factor. It's not an issue that required surgery or interfered with any of his job activities early on.

Even if the trial court did abuse its discretion by limiting BNSF's cross-

examination of Johanning, which we do not hold, any error would be harmless

43

because the testimony in BNSF's offer of proof is cumulative of the testimony of Johanning and Spengler that the trial court did admit.[55]

Despite the notations in the reporter's record to the contrary, Phillips argues in his brief that the foregoing evidence "was properly excluded." But he contends that the evidence is irrelevant because there is no evidence that Phillips himself was genetically predisposed to degenerative disc disease or degenerative spinal conditions. To the extent that the jury did not hear the complained-of testimony of Spengler, Mitchell, and Johanning, we hold that the trial court did not abuse its discretion by excluding it. Johanning testified that he excluded genetic conditions as a reason for Phillips's injury. In the absence of any evidence that Phillips had a genetic predisposition to such injuries—which absence BNSF conceded and the trial court indicated it found significant—we hold that the trial court did not abuse its discretion by excluding Johanning's testimony that "[i]t's a genetic issue" and Spengler's and Mitchell's testimony that genetics is a cause of degenerative disc disease.[56]

### B. Coworkers' Evidence of No Injury

BNSF also contends that the trial court abused its discretion by excluding Phillips's coworkers' testimony that they do not believe they were harmed by riding in locomotives. Again, to the extent that BNSF complains of the granting of

---

[55]*See id.*

[56]*See* Tex. R. Evid. 401; *Nichols*, 379 S.W.3d at 387–89.

Phillips's motion in limine, it has preserved no error.[57]  But BNSF did preserve error

by obtaining an unfavorable ruling and making an offer of proof regarding the

exclusion of testimony of five coworkers—Phillips's witnesses Clifford Dunson,

Buddy Blue, and Ricke Huguley and BNSF's witnesses William Sundquist and

James Brandon.   Nevertheless, we hold that the lay testimony of Phillips's

coworkers that they have no medical injuries is mere conjecture[58] and irrelevant to

whether Phillips suffered injuries as a result of his employment.[59]  The trial court

therefore did not abuse its discretion by excluding it.

## C.  Geometry Car Video

BNSF also complains that the trial court abused its discretion by excluding its

geometry car video as cumulative.  In offering the video excerpt, BNSF counsel

stated,

> We have a 2 minute and 37 second extraction from a geometry
> car ride that shows the geometrar (phonetic)—that—that shows various

---

[57] *See Sw. Country Enters., Inc.*, 991 S.W.2d at 493–94; *see also* Tex. R. App. P. 33.1(a)(1)(B), 33.2; Tex. R. Evid. 103(a)(2).

[58] *See Barraza v. Eureka Co., Inc.*, 25 S.W.3d 225, 232 (Tex. App.—El Paso 2000, pet. denied) (holding that testimony of plaintiff and her coworkers regarding cause of her injury was pure conjecture).

[59] *See Charter Oak Fire Ins. v. Perez*, 446 S.W.2d 580, 585–86 (Tex. Civ. App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.) ("The absence of a previous claim for lung injury [by any other employee] is a circumstance which affords very little, if any, basis for a reasonable presumption that Perez' sustaining of an occupational disease was not due to the nature of his employment, that the hazards of the disease do not exist in the nature of his employment or that such disease is not characteristic of his employment and peculiar to it.").

frogs and switches and turnouts and bridges and that sort of thing. And I would like to show that in conjunction with Mr. [Craig] Sloggett, to show: Hey, this is the geometry car, this is the equipment that it has, these are the conditions they look for, this is the track that we're traveling over.

After the trial court excluded the video excerpt, BNSF counsel continued questioning Sloggett:

> Q. All right. Mr. Sloggett, does the BNSF have the detection equipment that's designed to detect defects and to enhance quality control?
>
> A. Yes, we do, we have several different types of equipment.
>
> Q. All right. Would you tell the jury the types of equipment you have in that respect.
>
> . . . .
>
> A. Got geometry cars that go over and simulate like a engine car going over the track. It's got test equipment on it. Some of the latest in equipment anywhere available in the world that'll test how level the track is, is it the—the right geometry, you know, level, are the curves banked right for dips and bumps in the track, and all that. And all that equipment we ran frequently across the Clovis sub.
>
> . . . .
>
> Q. All right. And then the geometry car, you've been on the geometry car, have you not?
>
> A. Yes, several times.
>
> Q. All right. Have you been on the geometry car across this Clovis to Belen subdivision?
>
> A. Yes, I have.
>
> Q. And I just want to go through briefly just so the jury can get an idea of what this equipment looks like and—and what it does.

46

We've seen this before, but can you tell me what that is, tell jury what that is?

A.  That is one of our geometry cars, the one typically that runs across that portion of the railroad, the Clovis sub.

Q.  All right.  And it's got a locomotive and a power generator, and then you've got the car back there, right?

A.  That is correct.

Q.  All right.  Now, is there a front and back of the car?

A.  Yes, there is.

Q.  If you'd tell the jury, then, is that the front or the back?

A.  That's the back of the car.  That's where, like myself, the roadmasters, track inspectors, foreman would sit in looking at all the different screens and data that the car's putting out, and you're looking out the back of the car as you're going down the track.

Q.  All right.  So typically, the division engineer[s] will be up here, and then the road foreman would be back here communicating repairs?

A.  Yes.

Q.  All right.  Now, there are three screens up there.  This is a rail profile screen, and what's this screen about?

A.  That is the strip chart in the center there.

Q.  Okay.  And what is this?

A.  That's a summary of the events, whether it's defects.  Kind of tells you where it's at, a small track chart along.

. . . .

Q.   . . . .  So Mr. Sloggett, long story short, you have sophisticated equipment that goes through and measures various things and finds the defects; is that correct?

47

A.    That is correct.

Q.    All right. I want to show one last screen for you to have a look at, and let's talk about it. There are times, I guess, when you do find defects; is that correct?

A.    That is correct.

Q.    And the red ones are FRA defects; is that right?

A.    FRA and—and BNSF defects.

Q.    All right. And what about the yellow ones?

A.    They're a condition that's getting close, something that need— we need to over time fix before it gets to the condition where, you know, we have to slow the track down, slow the trains down.

Q.    All right. So not only do you detect actual defects, you detect development of potential defects and take corrective action in advance?

A.    That is correct.

. . . .

Q.    . . . . I guess the last thing I'd like to ask you is, in your—with your various jobs, have you had an opportunity to ride locomotives?

A.    A lot of times.

Q.    And tell the jury about what your exposure is to riding in locomotives.

A.    Even when I first started on the work crews and that, we ride the locomotives just to go out to work. You know, in and out of work and that. And throughout my career, I've rode several locomotives. And, you know, my experience on the Clovis subdivision, I—I ride eight to ten times a year on the locomotive, plus on, you know, riding the geometry car four times a year across there. So I would ride the locomotive a lot of times because I lived in Albuquerque and going over to Clovis. I would drive down from Albuquerque to Belen, get on the locomotive

48

because I could get—first off, I could get over to Clovis faster, and it was a lot smoother ride going down than driving the highway.

Q. All right. Now, just—just basically, what is your impression of just general, I understand you're not an engineer. You don't—you haven't been on there as much as Mr. Phillips. But when you were on locomotives, what is impression of the quality of ride?

A. Kind of like I stated earlier, I mean, I—I preferred that than driving—

Q. Right.

A. —I mean, it was a good ride, smooth ride.

Because Sloggett's testimony accomplished the same purposes that BNSF articulated when seeking the admission of the video excerpt into evidence, and because a trip on the rails had already been shown by an excerpt of Johanning's video, we cannot say that the trial court abused its discretion by excluding this video, or, if so, that such exclusion was harmful.[60] We overrule BNSF's fourth issue.

## V. Contributory Negligence

In its sixth and final issue, BNSF argues that the trial court erred by refusing to submit the issue of Phillips's contributory negligence to the jury. BNSF clarifies in its reply brief that this issue pertains to the FELA cause of action only, not to the LIA cause of action.[61] FELA recognizes contributory negligence as an affirmative

---

[60] See Tex. R. App. 44.1(a).

[61] See 45 U.S.C.A. §§ 53, 54 (West 2007); *Lilly v. Grand Trunk W. R.R. Co.*, 317 U.S. 481, 491, 63 S. Ct. 347, 353–54 (1943).

defense that does not bar relief but instead diminishes the recovery of a negligent employee.[62] The same standard of causation applies to the employee's contributory negligence as to the railroad's negligence.[63] As we have already explained,

> The test of causation under FELA is whether the railroad's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." Despite the lower burden under FELA, a plaintiff still bears the burden of presenting evidence from which a jury could conclude the existence of a probable or likely causal relationship as opposed to merely a possible one. The causal link between an event sued upon and the plaintiff's injuries must be shown by competent evidence.[64]

Thus, the test of causation for contributory negligence is whether Phillips's negligence, if any, had any part in producing his injuries.[65] And BNSF had the burden to present evidence from which the jury could conclude a likely or probable causal relationship, not merely a possible one.[66]

BNSF appears to contend that Phillips's failure to complain in writing, to "bad order" a locomotive, or to refuse to operate a particular locomotive if he believed the seat was substandard contributed to his injuries. BNSF does not develop its argument in any detail. We cannot say that a jury could conclude more than a

---

[62] *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 166, 127 S. Ct. 799, 805 (2007).

[63] *Id.* at 171, 127 S. Ct. at 808.

[64] *Nichols*, 379 S.W.3d at 382 (citations omitted).

[65] *See id.*

[66] *See id.*

possible causal relationship from Phillips's failure to complain and his injuries, especially given the evidence that when he realized that his work had caused his debilitating injuries, he retired. Similarly, Phillips's speeding in eight different locations over a two-month period in 1991, approximately fourteen years before his diagnosis, is evidence from which a jury could at most find a possible relationship. Finally, the evidence shows that when Phillips realized that his job *caused* his debilitating condition, rather than merely aggravated his minor pains, he did not ride a locomotive again. We hold that there is therefore no evidence that he continued "operat[ing] locomotives . . . many years after he drew a connection between his spinal injuries and" his employment. Because there is no evidence from which the jury could conclude that negligence, if any, of Phillips partially caused his injuries, the trial court did not err by omitting the contributory negligence instruction. We overrule BNSF's sixth issue.

## VI. LIA Claim

In its fifth issue, BNSF argues that there is no evidence that BNSF violated LIA, and that a remand is necessary if this court renders judgment in favor of BNSF on Phillips's LIA claim but renders judgment in favor of Phillips on his FELA claims. LIA claims are subsumed within FELA claims and thus not independent causes of action.[67] Because we have already held that the evidence supports the jury verdict

---

[67] *See Munns v. CSX Transportation, Inc.*, 579 F. Supp. 2d 924, 929 (N.D. Ohio 2008).

51

on Phillips's FELA claims, we do not need to address the sufficiency of the evidence supporting the jury's LIA findings.[68] Further, because the LIA claims are subsumed within Phillips's FELA claims and because the jury specifically found that BNSF was negligent by answering "Yes" to Question No. 1, there is no need for a *Casteel/Smith* analysis.[69] "[T]he damages awarded are consistent with either theory."[70] We overrule BNSF's fifth issue.

## VII. Conclusion

Having overruled BNSF's dispositive issues, we affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, MCCOY, and MEIER, JJ.

MEIER, J., filed a dissenting opinion.

DELIVERED: May 22, 2014

---

[68] *See* Tex. R. App. P. 47.1.

[69] *See Harris Cnty. v. Smith*, 96 S.W.3d 230, 233–34 (Tex. 2002); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (op. on reh'g).

[70] *See Urie v. Thompson*, 337 U.S. 163, 196, 69 S. Ct. 1018, 1038 (1949).